**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                  No. 97-4765

JAMES VINCENT WELLS,
Defendant-Appellant.

Appeal from the United States District Court
for the Eastern District of North Carolina, at Raleigh.
W. Earl Britt, Senior District Judge.
(CR-96-34-BR)

Argued: September 25, 1998

Decided: December 31, 1998

Before MURNAGHAN, WILKINS, and LUTTIG, Circuit Judges.

_____

Affirmed in part and reversed in part by published opinion. Judge
Murnaghan wrote the opinion, in which Judge Wilkins and Judge Lut-
tig joined.

_____

**COUNSEL**

**ARGUED:** Charles Theophilus Francis, WOOD & FRANCIS,
P.L.L.C., Raleigh, North Carolina, for Appellant. Anne Margaret
Hayes, Assistant United States Attorney, Raleigh, North Carolina, for
Appellee. **ON BRIEF:** Janice McKenzie Cole, United States Attor-
ney, Raleigh, North Carolina, for Appellee.

_____

**OPINION**

MURNAGHAN, Circuit Judge:

The instant case is an appeal by James Vincent Wells, who was convicted of all twelve counts of an indictment in relation to mail fraud, bank fraud, interference with Internal Revenue Service (IRS) officials and interstate transportation of stolen property. In addition, the district court departed upward from the sentencing guidelines because it found that Wells participated in terrorism as defined in 18 U.S.C. § 2331. Wells has alleged several errors, including the improper admission of prior bad acts testimony, insufficient evidence to support the verdict, the basis of the upward departure, and the calculation of the amount of loss resulting from his conduct.

FACTUAL BACKGROUND AND PROCEDURAL HISTORY

The record below provides us with the following factual background.

The government introduced evidence showing that between 1988 and 1993, Wells engaged in a large tobacco fraud conspiracy. The IRS conducted an audit of Wells and concluded that he had a substantial tax liability resulting from the unreported proceeds of the fraud. Thus, the IRS issued an assessment against Wells for approximately $1.8 million, and assigned to revenue officer Priscilla Smith the enforcement responsibilities. In October and November 1993, revenue officers Smith and Teresa Varnell issued tax liens on several properties that Wells either owned or controlled.

In November 1995, Wells and parties close to him began to send Smith and Varnell a series of documents relating to their enforcement efforts in connection with Wells' IRS assessment. On November 11, 1995, revenue officer Smith received a document captioned "Non-Statutory Abatement" from Wells' daughter, Doris Brantley, in response to Smith's attempt to schedule an appointment with Brantley to discuss the status of some real property believed to be owned or controlled by Wells. The Non-Statutory Abatement alleged that Smith's contact with Wells had been illegal, and it threatened Smith

2

with civil and criminal liability. The envelope in which it arrived bore Russell Dean Landers' return address.

On December 20 and 21, 1995, revenue officers Varnell and Smith, respectively, each received an "affidavit" and a "claim and demand letter" from Wells, himself. The letters discussed the dollar figure of the IRS jeopardy assessment. The accompanying affidavits threatened action against the officers and threatened liability of $1 million in pure silver if the revenue officers did not release IRS tax liens filed against property associated with Wells.

On January 5, 1996, Wells, Landers, and others attended a two day seminar presented by the Freemen, including Leroy Schweitzer. A portion of the seminar focused on the use of instruments known as comptroller warrants. Comptroller warrants are fraudulent financial instruments that, to some extent, look like legitimate financial instruments.[1]

Timothy Healy, an FBI Special Agent who infiltrated the Freemen organization, testified that Schweitzer warned class members that they could be arrested if they used the comptroller warrants, and that they should use a compilation of documents called "proof packs" to establish lack of fraudulent intent. Virtually none of the warrants were being accepted.[2]

Persons attending a Freemen conference could acquire as many as five comptroller warrants for $100; additional comptroller warrants cost the purchaser $100 each. Wells acquired several warrants during his stay in Montana, some of which had face values as high as $3.7 million. Each was issued jointly to Wells and a third party payee. During November and December 1995, Wells told associates that he could arrange loans for them. He then created lists of those to whom he would negotiate the warrants, which included the acquaintances as well as his creditors. Schweitzer's usual practice was to send Wells comptroller warrants whose face values were twice the amount requested.

_____

[1] Evidence was introduced tending to show that some of the banks had difficulty determining that the documents were fraudulent.
[2] There was evidence that two of the warrants were accepted by banks.

Soon after Wells returned to North Carolina, he distributed several of the warrants to acquire money. Testimonial evidence established that Wells distributed the following warrants in January, 1996, alone: on January 7, to Eastern Auto Sales for $155,704.00; on January 9, to Royster-Clark Corp. for $1,400,060.00 and to G.R.M. Enterprises for $770,000.00; on January 10, to Taylor Construction Co. for $433,478.00, to Heritage Bank for $7,778.14, to Simba Tech Auto Sales for $424,000.00, and to Travelinks for $384,000.00; on January 11, to the Internal Revenue Service for $3,705,858.00,[3] and to Centura Bank for $9,898.24; and on January 26, to Centura Bank for $21,074.00.

Wells sent cover letters along with the warrants to notify creditors that the warrants were intended to satisfy debts owed to them. Any additional funds were to be refunded to Wells. According to the letters, failure to refund excess amounts would constitute "criminal conversion" and trigger the obligation to pay high interest rates.

In January, 1996, Wells and Landers sent Officers Smith and Varnell documents captioned as "true bills." The "true bills" alleged that the revenue officers had placed illegal restraints on Wells' property and directed them to sign the documents to acknowledge their liability. The documents further stated that failure to comply within 10 days would result in the officers being held personally liable for $100 million in "silver coins" to Wells. Liability was to extend for 99 years.

Wells had begun hearing of rejections of the warrants before he had even distributed any of his own. In one instance, Landers had received notice from the Iowa Department of Human Services that it had rejected as invalid a comptroller warrant Landers had submitted to it. Landers responded to the rejection with a January 2, 1996, letter and provided a copy of his letter to Wells.

When Wells began distributing his comptroller warrants, he also received notices of rejection from banks. On January 12, 1996, he received two rejections. The next day, Wells was notified by mail of a rejection. During the latter half of January, Wells received six more

---

[3] This warrant was sent to the IRS to satisfy the tax liabilities resulting from the tobacco fraud operation.

4

rejections. He received still more rejections in February, including a rejection by the IRS.

Prajesh Patel, one of Wells' business associates, had more success. On January 18, 1996, he successfully deposited the Travelinks comptroller warrant as a result of the bank's errors. Wells often called Patel for information as to the status of that warrant, and was pleased that it was accepted.

Officers Smith and Varnell were "summoned" to appear before "Our One Supreme Court" in late January, 1996. The summonses informed them that the "Court" had entered $100 million judgments against each revenue officer personally. The officers were further directed to appear before the Our One Supreme Court on a specific date. Wells signed the summons, indicating that he was the complainant and "justices" of the "court" also signed the summonses.

The revenue officers later learned that the Our One Supreme Court was a tribunal associated with the Montana Freemen Organization that purported to hold trials, and enter judgments against private citizens and public officials. Smith also learned of plans by the Freemen to kidnap and kill a judge, and Varnell learned that the court had marshals upon whom they conferred powers of arrest. After learning those things, Smith and Varnell became afraid.

Now that the Travel Links account was open, Wells ordered Patel to write a series of checks against the account on Wells' behalf. Patel followed Wells' order, writing six Travelinks checks that totaled over $85,000. Wells immediately used two of the checks to purchase a Chevrolet Suburban and a recreational vehicle (RV) on the same date. A third check was used to buy Russell Landers a computer.

The Freemen conducted Smith and Varnell's hearing in their absence. Wells was present, and Landers presented Wells' case against the officers. After the hearing, Wells and others traveled to Montana in the Suburban and RV that had just been purchased. They brought the Suburban and RV to the Freemen compound on February 2, 1996. During a February 3, 1996, telephone conversation with business associate Prajesh Patel, Wells stated that he intended to acquire several more Suburbans to give to the Freemen for their use in Mon-

5

tana. Wells had a similar conversation with another acquaintance in North Carolina.

The Freemen intended to use Suburban vehicles to arrest and execute public officials in Jordan, Montana. Schweitzer wished to acquire approximately 20 Suburbans for this purpose. The FBI was concerned about Wells' arrival at the Freemen compound with the Suburban, because it placed the Freemen closer to their goal of being able to effect arrests.

After returning to North Carolina, Wells presented a second comptroller warrant with a face value of $254,000 to Patel, who had successfully negotiated a previous warrant. Patel was successful again, as bank errors permitted the warrant to be accepted on February 6.

Wells was arrested on February 8, 1996. During the trial, the district court realized an error in Count Three. As the indictment had then read, Wells was charged under 18 U.S.C. § 1002 with using a counterfeit document to defraud the government "for the purpose of enabling <u>himself</u> to obtain from the Internal Revenue Service . . . ." The statute actually reads "for the purpose of enabling <u>another</u> to obtain . . . ." 18 U.S.C. § 1002. (emphasis added). At the close of the evidence, the court amended the indictment to read correctly. Wells was convicted of all counts.

At sentencing, the government's Motion for Upward Departure based on Wells' involvement with the terrorist activities of the Freemen was granted. The court also increased Wells' base offense level because it found that he was a leader or organizer of the offenses charged. Finally, the court increased Wells' offense level 15 levels because the presentence report had included in its calculation of the loss occasioned by Wells' conduct several signed, sealed, or stamped but undistributed comptroller warrants. The district court calculated the aggregate amount of the loss, including the warrants, at approximately $17.4 million, which permitted the court to raise the base offense level 15 levels.

6

<u>DISCUSSION</u>

Wells has appealed his conviction of Count Three because the count as read to the grand jury did not constitute a crime. The district court amended Count Three at the close of all of the evidence to reflect a criminal act. Both parties have agreed that this was plain error, and that Wells' conviction and sentence as to that count should be reversed.**4**

I. Admission Of Evidence Relating To Wells' Prior Bad Acts

A. <u>Rule 404(b)</u>

Wells contends that the admission of evidence of his participation in a tobacco fraud and tax evasion scheme several years prior to the events giving rise to the charges in the instant case violated Rules 404(b), 402 and 403 of the Federal Rules of Evidence. Rule 404(b) of the Federal Rules prohibits the admission of evidence relating to "other crimes, wrongs or acts" if the purpose of the admission is to prove that the person acted in conformity with his character. <u>Id.</u> However, the evidence is admissible to prove other things, such as "motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." <u>Id.</u> The trial court's decisions to admit or exclude evidence are reviewed for abuse of discretion. <u>See</u> <u>United States v. Queen</u>, 132 F.3d 991 (4th Cir. 1997).

During the trial, the government introduced evidence tending to show that Wells had engaged in tobacco fraud and tax evasion between 1988 and 1993. Wells argues that the bank fraud and interference with tax officials charges in the instant case occurred three years after the other alleged activities, and are distinct from them. Therefore, he has urged they can have no relevance or purpose to the current allegations except to establish that he has a proclivity to commit crime. He cites several cases as support for that proposition, including <u>United States v. Hernandez</u>, 975 F.2d 1035, 1040 (4th Cir. 1992), <u>United States v. Sanders</u>, 964 F.2d 295 (4th Cir. 1992), and <u>United States v. Tate</u>, 715 F.2d 864 (4th Cir. 1983).

_____

**4** Wells has not appealed Count Twelve, which did not charge him with a crime but requested the forfeiture of the property discussed below.

7

Evidence that is "(1) relevant to an issue other than character; (2) necessary; and (3) reliable" is admissible under Rule 404(b). United States v. Rawle, 845 F.2d 1244, 1247 (4th Cir. 1988). Thus the evidence in question must meet this test to be admissible.

The evidence is clear that Wells' acts toward the IRS directly resulted from the fraudulent tobacco scheme and tax evasion. Margaret Davis, a former IRS agent, testified that she audited Wells' returns for the years 1988-91 and determined that Wells owed taxes for unreported income earned from the tobacco scheme.

As a result, she referred his report to the IRS criminal division. Because of the audit, the IRS made a $1.8 million assessment against Wells and began attempts to enforce it through liens.

Wells responded to the liens two years later by sending the threatening letters that formed the basis of the indictment on Counts 1, 4 and 5. Some of the letters even referenced the specific dollar amount -- $1,852,929 -- of the liens. Moreover, Wells presented a $3.7 million comptroller warrant -- the subject of the bank fraud charges in Counts 3 and 11 -- to pay his tax bill -- the $1,852,929 tax bill.

As is shown above, the evidence is relevant to show intent, motive, knowledge, and absence of mistake, which are proper bases under Rule 404(b). Moreover, it is also "necessary." Evidence is "necessary" when it "furnishes part of the context of the crime." Rawle, 845 F.2d at 1247, n.4 (citation omitted). The evidence above certainly provides context for the crimes. Finally, Wells has not challenged the reliability of the evidence. Thus, the evidence is admissible under Rule 404(b).

The other bad act evidence challenged by Wells is also admissible under 404(b). The government introduced evidence regarding transactions with Prajesh Patel, one of Wells' associates. Patel testified about the manner in which he and Wells transferred the money from the tobacco scheme. As Wells' behavior in the instant case is very similar, the evidence may properly be introduced to show absence of mistake. It also provides context for the crimes here. As such, the district court did not abuse its discretion by admitting the evidence.

8

B. Rule 403

Evidence that is admissible under Rule 404(b) may still be excluded under Rule 403 if its probative value is substantially outweighed by the possibility of unfair prejudice. See Fed. R. Evid. 403. We generally favor admissibility, and will find undue prejudice only if there is "a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." United States v. Bailey, 990 F.2d 119, 123 (4th Cir. 1993).

Wells' arguments are unavailing. He argues that since he stipulated to the tax assessment, proof of it was not very probative. Furthermore, even if it were, the underlying conduct leading to the assessment had no relevance to any issue in the case. However, as the evidence shows that warrants and letters were sent because of the outstanding tax lien, the probative value of the evidence outweighs any prejudice that might have existed. Furthermore, the court gave a limiting instruction. The evidence as to Wells' interaction with Patel is admissible for similar reasons.

II. Wells' Motion For Acquittal As To Counts 1, 4 and 5

A. The Jury Instruction In Count 1

Wells has challenged his convictions on Counts 1, 4 and 5. Additionally, he has challenged Count 1 because of a failure by the district court to instruct the jury as to the elements of 18 U.S.C. § 876. That statute addresses the use of the mails to send "threatening communications." Id. Either knowledge or intent is required, depending upon the substance of the communication mailed. Id. Since Wells did not object to this failure at trial, he must show that the failure was plain error. See Fed. R. Crim. P. 52(b).

Wells' argument is not persuasive. The United States Supreme Court has held that correction of an error not objected to below is appropriate where there is a plain error affecting "substantial rights." See United States v. Olano, 507 U.S. 725, 732 (1993). Even when that factor is satisfied, a reviewing court retains discretion to correct the

9

error, which it should not exercise unless the error seriously compromises "the fairness, integrity, or public reputation of judicial proceedings." Id. We also recognize these principles. See, e.g., United States v. Wilkinson, 137 F.3d 214, 224 (4th Cir. 1998), cert. denied, ___ U.S. ___, 119 S. Ct. 172 (1998). Where there is overwhelming evidence to convict the defendant, however, a failure to instruct does not compromise the fairness, integrity, or public reputation of judicial proceedings. See id. at 224. As demonstrated below, there is overwhelming evidence to convict Wells on all of the counts. Therefore, we decline to notice any error in the jury instructions in Count 1.

B. The Insufficiency Of The Evidence

Wells has challenged his convictions on Counts 1, 4 and 5 as not being supported by the evidence. Counts 1, 4 and 5 alleged a conspiracy to violate and actual violations of 18 U.S.C.§ 7212, which prohibits individuals from corruptly endeavoring to intimidate and impede IRS officers and employees. In addition, as stated above, Count 1 alleged that Wells conspired to mail threatening communications.

Wells has argued that he did not act "corruptly." We have interpreted the term "corruptly" to mean acting with the intent to secure an unlawful benefit for oneself. See United States v. Wilson, 118 F.3d 228, 230 (4th Cir. 1997); United States v. Bostian, 59 F.3d 477, 479 (4th Cir. 1995). Other circuits interpreting § 7212 have also interpreted the statute that way. See, e.g., United States v. Winchell, 129 F.3d 1093, 1099 (10th Cir. 1997).

Wells argued that the letters sent to the officers were so outrageous that they could not reasonably be taken as attempting to secure a financial benefit -- i.e., forgiveness of the tax lien. He has claimed that there was no threat of violence, at least no threat rising to the level that the courts have considered a threat. In fact, he had contended that the agents were not afraid when they received the letters and only became afraid much later, when they discovered that the Freemen organization was involved. Wells has cited cases addressing § 876 in support of that proposition. See, e.g., United States v. Prochaska, 222 F.2d 1 (7th Cir. 1955), cert. denied, 350 U.S. 836 (1955) (holding that there was a threat under § 876 where the defen-

10

dant demanded $10,000 and told the victim at that time "you only have one chance").

Nevertheless, the evidence is sufficient to support a conviction. When the defendant challenges a conviction for insufficiency of evidence, the reviewing court will "draw all reasonable inferences in the light most favorable to the government" to determine whether the evidence is sufficient to support the conviction. United States v. Dorlouis, 107 F.3d 248, 256 (4th Cir. 1997), cert. denied, ___ U.S. ___, 117 S. Ct. 2525 (1997). The government must show that there is "substantial evidence" to support the verdict. Id.

Viewed in the light most favorable to the government, there is substantial evidence to support the verdict. First, the evidence shows that Wells sent a document to IRS officer Smith entitled "Non-Statutory Abatement," which Smith was told to return within 30 days or face default judgment and civil or criminal penalties. He then sent both Smith and Officer Varnell letters entitled "Claim And Release Of Levy & Lien." Then, he sent them "true bills," to which they were required by Wells to respond, or they would be liable for a $100 million judgment.

While it is true that these letters are very outrageous, a reasonable juror could have determined to convict Wells. In United States v. Winchell, 129 F.3d 1093 (10th Cir. 1997), the defendant was convicted of a § 7212 violation because of conduct very similar to Wells'. Winchell sent letters to government officials which stated that they would be liable to him for an implausible amount. Id. at 1099. He made the same argument before the Tenth Circuit that Wells makes here, and the Tenth Circuit rejected it. Id. It found that a reasonable juror could have concluded that he violated the statute, even if the letters sent were not likely to be taken seriously. Id. (citation omitted).

Moreover, Wells' argument that there were no threats of violence -- serious violence -- are not persuasive. Wells argues that because neither agent believed that he or she was in danger when the letter was received, § 876 is not satisfied. However, the agents testified that they thought that they would be arrested, which they thought would involve some violence. Moreover, proof of actual intimidation is not

11

required. See United States v. Rosnow, 977 F.2d 399, 410 (8th Cir. 1992) (en banc), cert. denied, 507 U.S. 990 (1993). Furthermore, the agents testified that Wells' letters actually impeded their work to the extent that the letters took them away from their work. Thus, the convictions should be upheld.

Finally, the conspiracy conviction should also stand. Wells has contended that the conspiracy alleged in Count 1 had two objectives, and that the evidence was insufficient to satisfy one of the objectives, namely the mailing of threatening communications as defined and proscribed under § 876. Therefore, Wells has claimed that the entire conviction should be reversed. However, the Supreme Court recently held just the opposite when faced with that question. In United States v. Griffin, 502 U.S. 46, 60 (1991), the defendant was charged with a conspiracy to achieve several unlawful objectives. The evidence appeared to establish one of the bases of conviction but not the other. See 502 U.S. at 48. The Court held that the conviction on the conspiracy remains valid so long as a conspiracy to commit any one of the objectives was established. See 502 U.S. at 60. Thus, Wells' argument in the instant case has been rejected by the Supreme Court and the conviction should stand.

III. Was The Evidence Sufficient To Convict Wells On
        Counts 2 and 6-11?

Wells has contended that there was insufficient evidence to convict him on Counts 2 and 6-11, which are various counts of fraud and conspiracy, including bank fraud. Specifically, Wells was charged with mail fraud under 18 U.S.C. § 1341 (Count 2), conspiracy to commit bank fraud under 18 U.S.C. § 1344 (Counts 6, 7 and 10), conspiracy to transport stolen property in interstate commerce under 18 U.S.C. § 2314 (Counts 8 and 9), and corruptly endeavoring to obstruct and impede the due administration of IRS laws under 26 U.S.C. § 7212 (Count 11). As with his challenge to the sufficiency of the evidence for the other counts, the reviewing court "draws all reasonable inferences in the light most favorable to the government," Dorlouis, 107 F.3d at 256 (citation omitted), and affirms the conviction if "there is substantial evidence, taking the view most favorable to the government, to support it." Id.

12

The counts center around Wells' use of comptroller warrants -- documents passed by Wells as payment instruments-- which were, in fact, worthless. Wells' central argument is that he did not have the specific intent to defraud anyone in using the warrants and that he acted in good faith. Since mail fraud requires knowledge or intent, see 18 U.S.C. § 1341 ("Whoever, having devised, or intending to devise . . ."); 18 U.S.C. § 1344 ("Whoever knowingly executes . . ."), he claims that he is not guilty of these charges.

Wells supports his argument by pointing to several items in the record. First, he argues that he never admitted that he believed that the warrants were worthless. Second, if he did believe that they were invalid, he would not have sent them to the IRS, nor later admitted that he did. Third, some banks accepted the warrants, and could not at first glance tell that they were invalid. Fourth, LeRoy Schweitzer, one of the leaders of the Freemen, distributed the warrants with "proof packages," designed to help users demonstrate the validity of the warrants. Schweitzer also told Wells that the banks' rejection of the documents would result from their own ignorance, not the validity of the warrants.

Despite those facts, however, there is ample evidence to convict Wells. First, proof of actual knowledge is not necessary if the defendant was willfully blind. See United States v. Withers, 100 F.3d 1142, 1145 (4th Cir. 1996), cert. denied, ___ U.S. ___, 117 S. Ct. 1282 (1997). The fact of the warrants' worthlessness was not one to avoid. Second, the government has pointed to the series of seminars conducted by Schweitzer and the Freemen (during which several bizarre theories were raised) and asserts that Wells heard them and had reason to believe that the warrants would be invalid. Third, Schweitzer told the seminar attendees that they should prepare to be arrested and that banks often rejected warrants. Fourth, and perhaps most amazing, the first five warrants cost Wells $100 (each one thereafter was $100 apiece), and one of the warrants alone had a face value of $3.7 million. Finally, Wells generally did not distribute them himself but distributed them through third parties.

Since there appears to have been substantial evidence that Wells either knew of the fraudulent character of the warrants, or deliberately

ignored obvious signs that they were invalid, his conviction of the above counts should stand.

IV. Did The District Court Err In Departing Upward
In Wells' Sentence?

Wells has argued that the government improperly departed upward from the sentencing guidelines based on domestic terrorism activities. A sentencing court's decision to depart upward or downward from the sentencing guidelines is reviewable under an abuse of discretion standard. See Koon v. United States, 518 U.S. 81, 91 (1996).

At the time Wells committed the crimes, the departure for "terrorism" addressed international, not domestic terrorism. See U.S. SENTENCING GUIDELINES MANUAL § 3A1.4 (1994). The guidelines were amended to include domestic terrorism after commission of the crimes but before sentencing. See U.S. SENTENCING GUIDELINES MANUAL § 3A1.4 (1996). The amendment is inapplicable to Wells because it is a substantive amendment that would retroactively increase Wells' sentence. See, e.g., United States v. Capers, 61 F.3d 1100, 1109 (4th Cir. 1995) (stating that courts may retroactively apply clarifying, but not substantive amendments to the Guidelines). Thus, Wells has contended that there is no valid basis upon which the government may seek successfully to increase his sentence upward.

Although there was no specific provision at the time authorizing a court to consider "domestic terrorist" activities, the catch-all provision of the Guidelines is certainly broad enough to allow such consideration. Under 18 U.S.C. § 3553(b), the sentencing court can deviate from the Sentencing Guidelines to take into account any aggravating or mitigating circumstance that the Guidelines did not adequately consider. Id. In addition, the policy statement of the Sentencing Guidelines also provides for departure in such circumstances. See U.S. SENTENCING GUIDELINES MANUAL § 5K2.0 (1994) ("Circumstances that may warrant departure from the guidelines pursuant to this provision cannot, by their very nature, be comprehensively listed and analyzed in advance."). Thus, the district court did not abuse its discretion in departing upward for Wells' domestic terrorist activities.

Wells then has made the contention that even if the court may depart from the Guidelines on that ground, his activities did not con-

14

stitute "terrorism." Terrorism, as defined by 18 U.S.C. § 2331 (the international terrorism statute), as "violent acts or acts dangerous to human life that are or would be a violation of the laws of the United States or any state," id. at (a), that are intended (1) to "intimidate or coerce" civilians; (2) "to influence the policy of a government by intimidation or coercion; or" (3) "to affect the conduct of a government by assassination or kidnapping." Id. at (b). Of course, the terrorism defined here must be international. Id. at (c).

Wells contends that his activities were not violent. He contends that the statute does not contemplate plans or schemes, but "acts." Since he did not commit any violent acts, he contends, the departure cannot stand.

He points to several facts in support of his argument. First, he argues that although the Freemen discussed violence toward government officials, they never hurt any of them. Second, Wells did not sign any of the "[w]anted" posters, or personally participate in the Civil Rights Task Force's (the Freemen's enforcers) violent acts, if any. He thus argues that he is being punished for being a member of the Freemen organization, an arguable violation of the First Amendment.

However, there is ample evidence that shows that Wells' plans and activities support the upward departure. First, he agreed to participate in the grand jury of "our one Supreme Court," the "court" that the Freemen established to try officials. That court was also the forum of Wells' "trial" of IRS agents Smith and Varnell. Second, Wells bought a Chevrolet Suburban that he brought to Montana. The plan, as articulated by Schweitzer to the seminar attendees, was to use the Suburbans to abduct government officials, who would later be hanged. He intended to "bring a lot more of 'em out here." In fact, Wells was the only one supplying the Suburbans. Third, Wells otherwise actively participated in the group, despite knowing its violent goals, and even helped the group prepare. Finally, he has not challenged the district court's finding that the group engages in terrorist activities.

These facts counterbalance Wells' contention that he neither knew of the Freemen's plans nor was involved in them. His use of the "court" for his own dispute with IRS officials, given the intention of

15

the Freemen to injure or kill government officials, can be considered a "terrorist" act. In addition, as the only supplier of the vehicles that were to be used in a violent plan about which everyone knew, it is unlikely that Wells neither knew nor had reason to know of the Freemen's activities. Since, as Wells points out, the Guidelines permit a defendant to be held responsible for the conduct of his associates if that conduct was reasonably foreseeable, see U.S. SENTENCING GUIDELINES MANUAL § 1B1.3(b), his participation in the planning of violence may properly give rise to liability. Hence, the district court did not abuse its discretion by departing from the guidelines.

V. Did The District Court Err In Finding That
         Wells Was A Leader?

Wells has contended that the district court erred in finding that he was a leader or organizer of the Freemen, a finding that increased his sentence under U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(c). The finding was made in the presentence report. Factual findings by the district court are reviewable under the clearly erroneous standard. See United States v. Richardson, 939 F.2d 135 (4th Cir. 1991), cert. denied, 502 U.S. 1061 (1992). However, where, as here, the defendant did not object to the finding below, the finding is reviewable only for plain error. See United States v. Grubb , 11 F.3d 426, 440-41 (4th Cir. 1993).

Wells has contended that he could not be a leader under the Guidelines, because the district court never made any determinations that the people under his direction committed criminal acts. The Commentary to section 3B1.1(c) states that the persons following the directions must be "participants" -- i.e., criminally responsible individuals who need not have been convicted. See U.S. SENTENCING GUIDELINES MANUAL § 3B1.1(c), cmt. 2. Since all of the persons to whom Wells gave the warrants testified that they did not know that the warrants were worthless, Wells has argued that there were no"participants" for him to supervise.

However, it appears that at least one of those persons, Prajesh Patel, was criminally responsible. Patel testified that although he doubted the validity of the warrants, he attempted to cash them anyway because he was having financial difficulty. Moreover, he once

16

told Wells that Wells "can't write [a warrant] personally to me, that's bad." The above evidence allows the conclusion that Patel knew or should have known of the fraudulent character of the warrants, and thus qualifies as a criminally responsible individual.

## VI. Did The District Court Err In Calculating The Amount Of Loss That Resulted From Wells' Conduct?

Wells claims that the district court erred in calculating the amount of loss, thereby increasing his sentence by 15 levels. Specifically, he claims that the court should not have included in its calculation warrants that were in sealed envelopes but never mailed to the addressee. If these warrants are excluded from calculation, he argues, the amount of loss drops below $10 million, which is the threshold amount for the 15 level increase. See U.S. SENTENCING GUIDELINES MANUAL § 2F1.1(b)(1)(P).

The dispute over the scope of calculable material-- i.e., the meaning of "intended loss" under the Guidelines-- is a legal one which must be reviewed de novo. See United States v. Loayza, 107 F.3d 257, 265 (4th Cir. 1997) (citation omitted). However, the amount of loss is a factual determination that is reviewable for clear error. Id.

The Commentary to the Guidelines states that "if an intended loss that the defendant was attempting to inflict can be determined, this figure will be used if it is greater than the actual loss." U.S. SENTENCING GUIDELINES MANUAL § 2F1.1, cmt. n.2 (1994). Wells' argument is that the fact that the warrants were not mailed creates doubt as to his intent to cause loss, even if the fraudulent documents are addressed, sealed and stamped.

The Fourth Circuit has not addressed this exact issue. Both parties cite United States v. Chappell, 6 F.3d 1095 (5th Cir. 1993), cert. denied, 510 U.S. 1183 (1994), as giving some guidance to the issue, with Wells attempting to distinguish it from his case. In Chappell, the defendant was involved in a counterfeit check scheme. Id. at 1097. The district court based Chappell's sentence on, inter alia, five completed checks seized from the defendant's car, 16 other completed checks from which the dollar amounts were determined with some diligence, and 51 blank checks for which the dollar amounts were

17

estimated based on previously recovered checks. Id. at 1101. The Fifth Circuit affirmed the district court's use of the checks that had not yet been cashed, reasoning that it was not clearly erroneous to find that the defendant intended to cause loss with regard to those instruments. Id.

Wells has attempted to distinguish Chappell on the ground that the defendants in Chappell possessed a detailed plan to distribute the checks. Id. Moreover, the appellate court determined that the district court calculation of the loss was conservative. Id. By contrast, Wells argues, he did not possess any detailed plan to distribute the undistributed warrants in a fraudulent manner, nor was the court's $17.4 million estimate "conservative."

However, Wells' argument is not convincing. As established above, Wells had ample reason to question the validity of the warrants, even if he was not actually told that they were invalid. In addition, he appeared to have a detailed way of distributing the warrants through third parties, as discussed above. Finally, unlike the defendants in Chappell, no estimates or conjecture are needed because the warrants in Wells' possession were completed. Thus, the amount of loss would not have been speculative. Because Wells cannot distinguish Chappell, the one case to address a similar issue, his intended loss calculation should include the checks found in his possession.

The district court correctly included those amounts on the face of the warrants that Wells had sealed and addressed, but not mailed, and its determination that the amount is over $10 million is not clearly erroneous. The Guidelines state that the intended loss figure may be used if it: (1) can be determined and (2) is greater than the actual loss. See U.S. SENTENCING GUIDELINES MANUAL § 2F1.1, cmt. n.2 (1994). Here, the intended loss figures can be determined by the face values of the warrants. As over $10 million in warrants were either completed and mailed or were signed and sealed by Wells directly or by others (such as Patel) at his direction, a 15-level increase in the sentence is appropriate.**5**

_____

**5** The district court found the exact amount of loss to be $17,411,355.38. However, it appears that the total aggregates the actual

18

CONCLUSION

We affirm the district court's rulings as to: (1) admitting the evidence of prior schemes under Fed. R. Evid. 404(b) and 403; (2) convicting Wells on Counts 1, 2 and 4-11; (3) departing upward for terrorist activities; (4) concluding that Wells was a leader within the meaning of the Sentencing Guidelines; and (5) ruling that the signed, sealed, stamped but undistributed warrants were within the scope of "intended loss." We reverse the district court's rulings as to Wells' conviction on Count 3.

AFFIRMED IN PART AND REVERSED IN PART
_____
loss suffered by the victims with the intended losses. Since the statute permits the use of either the intended loss figures or the actual losses, whichever is greater, aggregation is not appropriate. In any event, since the intended loss figures are well above $10 million, the increase is proper.

19