**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

_____

**No. 08-5116**

_____

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

      v.

ROOSEVELT SIMMONS,

             Defendant - Appellant.

_____

Appeal from the United States District Court for the Northern District of West Virginia, at Wheeling.  Frederick P. Stamp, Jr., Senior District Judge.  (5:07-cr-00040-FPS-JES-1)

_____

Submitted:  April 21, 2010          Decided:  May 27, 2010

_____

Before WILKINSON, GREGORY, and DAVIS, Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

Travis R. Fitzwater, LAW OFFICE OF TRAVIS R. FITZWATER, Morgantown, West Virginia, for Appellant.  Sharon L. Potter, United States Attorney, David J. Perri, Robert H. McWilliams, Jr., Assistant United States Attorneys, Wheeling, West Virginia, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Roosevelt Simmons appeals his conviction and sentence on one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2). He contends that the district court committed reversible error in conducting a jury view of the crime scene, permitting identification testimony of Simmons, denying a motion to suppress the result of a gun-shot residue test (GSR test), admitting evidence that Simmons used a firearm while possessing the ammunition, and enhancing his sentence. For the foregoing reasons, we affirm.

I.

Early on the morning on November 4, 2007, Roosevelt Simmons called 911 after returning home from work to report that his apartment at the Eagle Court Apartments in Wheeling, West Virginia, had been burglarized. Simmons told the responding officers that he believed his neighbors had committed the crime as retaliation for Simmons's reporting them to the police for loud music several nights earlier. Simmons then left his apartment and drove to stay with his girlfriend, Nina Speights. The next morning, Simmons and Speights's cousin, Cameron Sealey, drove to Steubenville, Ohio, to place a wager on a football game. The two then drove back to the Eagle Court Apartments. Proceeding at a high rate of speed, Simmons pulled up

2

haphazardly in front of his apartment building and entered the building along with Sealey. Simmons approached apartments 322 and 323, his direct neighbors, and began banging on their doors, yelling that someone must have known about the burglary on November 4. Sarah Ruthers and her boyfriend Richard Gooch were in apartment 322 at the time. Both noticed Simmons's car as it entered the lot and parked. Both recognized Simmons as he exited the car and recognized his voice in the hallway. Although neither Ruthers nor Gooch considered themselves friends with Simmons, Gooch shared a cigarette with him on several occasions and the pair often saw Simmons coming and going from the apartment.

Gooch did not open the apartment door, but a person in apartment 323, Jaime Conley,[1] did. Simmons began yelling at Conley about his apartment break-in, "getting in her face," and telling her that whoever had robbed him had "f***ed with the wrong n*****r." Conley noticed another man, who she did not recognize, standing in the hallway. Conley told Simmons that she knew nothing about the burglary and, frightened, slammed the door in his face. Conley did not know Simmons's name, but she recognized him as the man that had come over several nights earlier to complain about loud music in the apartment.

---

[1] Conley was not a resident of the Eagle Court Apartments but was staying with friends in the complex at the time.

3

Gooch began watching the events unfold through the peephole in Ruthers's apartment. Gooch heard Simmons verbally abusing Conley and also saw a man he did not recognize standing further down the hallway. After Conley slammed the door, Gooch saw Simmons pull a handgun from a brown paper bag he was holding. Gooch told Ruthers to call 911 and retreated back into the apartment. Moments later the residents heard gunfire and the sound of breaking dishware and glass. Gooch heard four shots in quick succession followed by a fifth shot seconds later. One of the occupants of apartment 323 called 911, as did Ruthers. Ruthers, who had been seated in her living room looking out over the parking lot, saw the unidentified man exit the building into the parking lot prior to the shots being fired. Gooch and Ruthers then watched together as Simmons and the unidentified male entered the car and left the parking lot at a high rate of speed with Simmons driving. Sealey testified that he was the man standing down the hallway and that, when he saw Simmons pull a gun, he tried to dissuade him from using it. Unable to do so, Sealey fled the apartment building and heard multiple gunshots as he reached the parking lot.

Officers from the Wheeling Police Department responded to the scene. Gooch and Ruthers both identified "Rosie" Simmons as the shooter and provided a description of him and his car.

4

Conley also provided a description of the suspect and told officers that he lived in the building.

After leaving Eagle Court, Simmons and Sealey returned to Speight's home, where Sealey witnessed Simmons hide the gun in a laundry detergent box on top of the refrigerator. Twenty minutes later Officer Ben Heslep with the Bellaire, Ohio, Police Department[2] spotted and stopped a vehicle matching the description provided by Gooch and Ruthers. With Simmons stopped, officers from the Wheeling Police Department escorted Gooch to the scene to see if he could identify Simmons. Apart from Simmons, only police officers in uniform were present at the scene when Gooch arrived. While Gooch stayed in his vehicle, Simmons was asked to stand up out of the police vehicle where he was being detained; Gooch identified Simmons as the shooter and Simmons was placed back in the car. Simmons was then transported to the Bellaire Police Department, where officers conducted a gun-shot residue test (GSR test) on Simmons's hands. At the time the officers conducted the GSR test, Simmons had been requesting to use the restroom.

At the Eagle Court Apartments, officers recovered five spent 9 mm. caliber shell casings in the hallway. Four were clustered together outside of doors 322 and 323 and the fifth

_____

[2] Bellaire, Ohio, is located directly across the Ohio River from Wheeling, West Virginia.

was fifteen feet down the hall.  Three bullet holes were found in the door to apartment 322 and two holes were found in the door to apartment 323.  One of the bullets shattered the dishware in Ruthers's apartment.  Officers never recovered the firearm used in the shooting.

Based upon the foregoing, a federal grand jury indicted Simmons on December 4, 2007, on one count of being a felon in possession of ammunition, in violation of 18 U.S.C. § 922(g)(1) and 924(a)(2).  During the pretrial period, investigators with the Bureau of Alcohol, Tobacco, and Firearms ("ATF"), obtained letters and jail phone recordings between Simmons and Speights.  In these conversations, Simmons informed Speights that he had hidden the gun in a laundry box in Speights's apartment and arranged for his sister to remove the gun.  Simmons also suggested how Speights should make her statements to investigators.  In addition, a prison inmate approached the Government with information that Simmons had discussed the possibility of attempting to kill or seriously injure the federal prosecutor in his case.  Simmons apparently hoped that removing the prosecutor would delay his trial and provide him grounds to move for dismissal under the Speedy Trial Act.

Prior to trial, Simmons moved to exclude the results of the GSR test as well as both out-of-court and in-court

6

identification testimony from Gooch. The district court, adopting the recommendation of the magistrate judge assigned to the case, denied both motions. A jury trial was conducted from August 26 to August 28, 2008. During the trial, the district court conducted a jury view of the crime scene outside the presence of Simmons, who was detained in a van in the parking lot. The jury ultimately convicted Simmons on the ammunition possession charge. The district court conducted a sentencing hearing on November 3, 2008, and sentenced Simmons to 120 months imprisonment. Simmons noted a timely appeal.

II.

On appeal, Simmons contends that the district court committed reversible error in conducting a jury view of the Eagle Court Apartments, permitting Gooch's identification testimony, denying the motion to suppress the GSR test, and admitting evidence of the shooting.[3] We address each contention in turn.

---

[3] Simmons also contends that the district court committed reversible error in sentencing him. Specifically, Simmons argues that it violates the Sixth Amendment to impose sentencing enhancements even under an advisory Guidelines scheme and even if the resulting sentence is below the statutory maximum. Simmons concedes that his argument is foreclosed by Booker v. United States, 543 U.S. 220 (2005), but contends that Booker was wrongly decided. Booker remains binding law, however, and we thus reject Simmons's argument.

7

A.

Simmons first contends that the district court committed reversible error in conducting a jury view of the Eagle Court Apartments during the trial. "The federal courts recognize their inherent power to permit a jury view of places or objects outside the courtroom. The decision to permit a view is entrusted to the sound discretion of the trial court." United States v. Passos-Paternina, 918 F.2d 979, 986 (1st Cir. 1990) (citations omitted). See also United States v. Woolfolk, 197 F.3d 900, 905 (7th Cir. 1999) (noting that a district court's ruling on a motion for a jury view is reviewed for abuse of discretion).

Three months prior to trial, the Government moved for a jury view of the Eagle Court Apartments and included a proposed list of sites. The district court granted the motion as to the sites described by the Government and also offered Simmons the opportunity to suggest additional sites.

On the first day of the trial, the district court, accompanied by counsel, the Defendant, and the lead investigator, Agent James E. Sirbaugh of the ATF, took the jury to view the Eagle Court Apartments. The Defendant stayed in a van with U.S. Marshals during the view. Before entering the apartments, Agent Sirbaugh suggested to the district court, outside the presence of the jury, that the jurors look at the

8

bullet holes in the apartment doors from both sides, a request the district court granted. Once inside the apartment, and again outside the jury's presence, Agent Sirbaugh suggested that the jurors see the holes in Ruthers's refrigerator. Simmons's counsel objected to that view because it was not on the Government's pretrial list of sites, and the district court sustained the objection. The jurors completed the view and returned to court.

On appeal, Simmons does not contest the conducting of a jury view, but rather argues that, given Special Agent Sirbaugh's comments, the jury view was transformed from a permissible crime scene inspection into an unconstitutional opportunity for Agent Sirbaugh to testify outside of the Defendant's presence. Simmons also argues that he was unable to communicate with counsel during the jury view, and that this failure kept Simmons from having his counsel point out several important features of the scene.

We do not believe either situation constituted reversible error in this case. The presence of Simmons's counsel during the view resolves any constitutional issues arising from Simmons's inability to take part in the view. See Snyder v. Massachusetts, 291 U.S. 97 (1934), (holding that a jury view with counsel present is constitutional). In addition, Agent Sirbaugh's comments were not made in front of the jury,

9

and, even if they were, he was simply assisting the district court in finding the sites already supplied by the Government.

Moreover, even assuming the district court erred in conducting the view, Simmons cannot show that such error was harmful. This court has held that jury views of crime scenes, both court-ordered and unsupervised, are subject to harmless error review. See Arnold v. Evatt, 113 F.3d 1352, 1361 (4th Cir. 1997) (court-ordered jury view subject to harmless error review); Sherman v. Smith, 89 F.3d 1134, 1137 (4th Cir. 1996) (en banc) (unsupervised jury view of crime scene subject to harmless error review). In determining the possible harm of any error, this court should "look to the nature and extent of the [jury's] activity and assess how that activity fit into the context of the evidence presented at trial." Sherman, 89 F.3d at 1138. "The level of conjecture inherent in this inquiry is reduced, making it even more appropriate for harmless-error analysis, when the jury view is personally supervised by the judge." Arnold, 113 F.3d at 1361. An error is harmless "if a reviewing court is able to 'say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error.'" United States v. Basham, 561 F.3d 302, 327 (4th Cir. 2009) (quoting Kotteakos v. United States, 328 U.S. 750, 765 (1946)).

10

Applying this standard, any error in this case was harmless. Two witnesses who knew Simmons, Gooch and Ruthers, testified that he was the person in the hallway, and Gooch and Conley both testified that Simmons drew a gun. Simmons's own companion that day, Cameron Sealey, testified that Simmons drew a gun and that, in response, Sealey fled the apartment building and subsequently heard gunshots. Conley and Gooch both testified that they heard gunfire almost immediately after Simmons drew the gun. During pretrial incarceration, Simmons told his girlfriend Speights that he had hidden the gun and that his sister was disposing of it. Sealey further testified that he watched Simmons hide the gun in Speight's home. Given this wealth of testimony, it is difficult to see how Agent Sirbaugh's suggestion or Simmons's exclusion were prejudicial. Simmons suggests that he would have asked for different site views regarding the ability to see the parking lot from the apartments, but he had the opportunity to do so during the pretrial period and also had ample opportunity to cross-examine Ruthers and Gooch on that point.

B.

Next, Simmons argues that the district court erred in permitting Gooch's identification testimony at trial. "Due process principles prohibit the admission at trial of an out-of-court identification obtained through procedures 'so

11

impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification.'" United States v. Saunders, 501 F.3d 384, 389 (4th Cir. 2007) (quoting Simmons v. United States, 390 U.S. 377, 384 (1968)). No due process violation occurs if the "identification was sufficiently reliable to preclude the substantial likelihood of misidentification." United States v. Johnson, 114 F.3d 435, 442 (4th Cir. 1997); see also Manson v. Brathwaite, 432 U.S. 98, 106 (1977) (stating that the central question is "whether under the totality of the circumstances the identification was reliable even though the [identification] procedure was suggestive") (internal quotations omitted).

We consider the admissibility of identification testimony in two steps:

> First, the defendant must show that the photo identification procedure was impermissibly suggestive. Second, if the defendant meets this burden, a court considers whether the identification was nevertheless reliable in the context of all of the circumstances.

Saunders, 501 F.3d at 389-90.

If a witness's out-of-court photo identification is unreliable and therefore inadmissible, any in-court identification is also inadmissible. Simmons, 390 U.S. at 383-84. On appeal, we may assume the suggestiveness of a identification procedure and move directly to the second step. Holdren v. Legursky, 16 F.3d 57, 61 (4th Cir. 1994).

12

The magistrate judge denied Simmons's motion to exclude identification testimony after a hearing, and the district court adopted that recommendation. The district court assumed that the photo identification procedure was impermissibly suggestive but concluded that the identification was still reliable because Gooch knew Simmons personally and made the identification roughly one half-hour after the shooting.

We agree with the district court that, even assuming the initial procedure was impermissibly suggestive, Gooch's identification was reliable and thus admissible. We have explained that five factors should be considered in assessing the reliability of an out-of-court identification: (1) the witness's opportunity to view the suspect at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's initial description of the suspect; (4) the witness's level of certainty in making the identification; and (5) the length of time between the crime and the identification. Saunders, 501 F.3d at 391. "In addition, courts may consider other evidence of the defendant's guilt when assessing the reliability of the identification." Id. (internal quotation marks and alterations omitted).

Applying these factors, Gooch's identification was reliable. First, Gooch was certain that Simmons was the person

13

in the hallway, and Gooch was personally familiar with Simmons because they lived in the same apartment complex. While Gooch and Simmons lived on different floors, Gooch's girlfriend, whom Gooch was visiting that day, lived next to Simmons. After the shooting, Gooch had Ruthers immediately dial 911 and identify, by name, Simmons as the perpetrator. The actual identification was made one half-hour after the shooting. Gooch had a good opportunity to view Simmons's approach and exit from the apartment complex and recognized his car. In addition, two other witnesses, Ruthers and Sealey, placed Simmons in the apartment building. Likewise, Conley also identified Simmons at trial as the man that she spoke with that day.

Because Gooch's identification was reliable, the district court correctly permitted his in-court testimony and identification.

C.

Simmons asserts that the district court erred in denying his motion to suppress the GSR test taken at the Bellaire Police Department. In addressing the denial of a motion to suppress evidence, we review the district court's findings of historical fact for clear error, "giving due weight to inferences drawn from those facts by resident judges and local law enforcement officers." Ornelas v. United States, 517 U.S. 690, 699 (1996). We review de novo the ultimate legal

14

conclusion. Id. And, "[b]ecause the district court denied the motion to suppress, we construe the evidence in the light most favorable to the Government." United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004).

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. Warrantless searches "are per se unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." United States v. Bush, 404 F.3d 263, 275 (4th Cir. 2005) (quoting Mincey v. Arizona, 437 U.S. 385, 390 (1978)). One of the well-recognized exceptions to the warrant requirement is a search incident to a lawful arrest. See United States v. Currence, 446 F.3d 554, 556 (4th Cir. 2006). Pursuant to this exception, law enforcement officers following a lawful arrest may search "the arrestee's person and the area 'within his immediate control.'" Id. (quoting Chimel v. California, 395 U.S. 752, 763 (1969)). Another such exception is when exigent circumstances exist, situations "where police officers (1) have probable cause to believe that evidence of illegal activity is present and (2) reasonably believe that evidence may be destroyed or removed before they could obtain a

15

warrant." United States v. Cephas, 254 F.3d 488, 494-95 (4th Cir. 2001).

The magistrate judge, after conducting an evidentiary hearing, concluded that Simmons was lawfully arrested and that, given the inherent destructibility of gun-shot residue evidence, the police were permitted to run the GSR test without a warrant. The district court adopted that recommendation, and we conclude that the district court correctly denied the motion to suppress.

Recently, the Fifth Circuit concluded that a GSR test is a reasonable search incident to arrest. United States v. Johnson, 445 F.3d 793, 795-96 (5th Cir. 2006). As the court explained, "[b]ecause the presence of gun powder on his hands was relevant evidence that [the defendant] (or merely time) could have eventually removed or destroyed, if his arrest was valid, the performance of the gun powder residue test was lawful, and the admission of the results at trial was proper." Id. at 795-96. Such a result is dictated by Cupp v. Murphy, 412 U.S. 291 (1973), in which the Supreme Court concluded that police, consistent with the Fourth Amendment, could take fingernail samples incident to a lawful arrest. Id. at 295-96. In Cupp, the Court explained the basis for the search incident to arrest doctrine was the belief that "it is reasonable for a police officer to expect the arrestee to use any weapons he may have and to attempt to destroy any incriminating evidence then

16

in his possession.  Id. at 295.  Applying that rationale, the Court concluded that the police were justified in performing a "very limited search necessary to preserve the highly evanescent evidence they found under his fingernails."  Id.

Likewise, the GSR test in this case was constitutional.  Simmons does not contest the lawfulness of his arrest, and, given that concession, the GSR test, a "very limited search," was appropriate as a search incident to arrest. In the alternative, exigent circumstances also justify the search because Simmons was requesting to use the bathroom and both parties agree that washing his hands could have removed any gun-shot residue.  The district court did not err in denying the motion to suppress.

D.

Simmons also challenges the district court's decision to permit testimony regarding the shooting in order to prove Simmons's possession of ammunition, arguing that the evidence was inadmissible under Federal Rules of Evidence 404(b) and 403. We review evidentiary rulings of the district court for abuse of discretion.  United States v. Delfino, 510 F.3d 468, 470 (4th Cir. 2007).  We will not "'vacate a conviction unless we find that the district court judge acted arbitrarily or irrationally' in admitting evidence."  United States v. Benkahla, 530 F.3d

17

300, 309 (4th Cir. 2008) (quoting United States v. Ham, 998 F.2d 1247, 1252 (4th Cir. 1993)).

Under Rule 404(b), "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). The Rule 404(b) inquiry, however, applies only to evidence of other acts that are "extrinsic to the one charged." United States v. Chin, 83 F.3d 83, 87 (4th Cir. 1996). "[A]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." Id. at 87-88. "Evidence of uncharged conduct is not 'other crimes' evidence subject to Rule 404 if the uncharged conduct 'arose out of the same series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial.'" Siegel, 536 F.3d at 316 (quoting United States v. Kennedy, 32 F.3d 876, 885 (4th Cir. 1994)).

Rule 403 provides a more limited bar to otherwise admissible evidence:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Fed. R. Evid. 403.

18

Rule 403 is likewise a rule of inclusion, "generally favor[ing] admissibility . . . ." United States v. Wells, 163 F.3d 889, 896 (4th Cir. 1998). District judges enjoy wide discretion to determine what evidence is admissible under the Rule. See United States v. Love, 134 F.3d 595, 603 (4th Cir. 1998). We "review a district court's admission of evidence over a Rule 403 objection under a broadly deferential standard." Id. (internal quotations omitted). Indeed, "[a] district court's decision to admit evidence over a Rule 403 objection will not be overturned except under the most extraordinary of circumstances, where that discretion has been plainly abused." United States v. Williams, 445 F.3d 724, 732 (4th Cir. 2006) (internal quotations omitted). In reviewing the admission of evidence, we construe the evidence in the "light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." United States v. Simpson, 910 F.2d 154, 157 (4th Cir. 1990).

Applying these standards, we have little difficulty concluding that the district court did not abuse its discretion in admitting the challenged evidence. First, evidence of the shooting satisfied Rule 404(b) because it was intrinsic to the crime charged—it was part of the same series of transactions as the offense and helped to tell the story of the crime. In addition, such testimony does not run afoul of Rule 403 because,

19

as intrinsic evidence, it was highly probative. The evidence that Simmons was seen with a gun immediately before a shooting occurred was damaging to Simmons's case, but that is not the standard under Rule 403 and such evidence was not unfairly prejudicial.

## III.

For the foregoing reasons, we affirm the district court's judgment. Simmons's motions to file supplemental briefs are denied. We dispense with oral argument because the facts and legal contentions are adequately presented in the materials before the court and argument would not aid the decisional process.

<u>AFFIRMED</u>