# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 18, 2014          Decided October 31, 2014

No. 11-3003

UNITED STATES OF AMERICA,
APPELLEE

v.

MADHATTA ASAGAL HAIPE, ALSO KNOWN AS HATTA HAIPE,
ALSO KNOWN AS USTADZ MADHATTA, ALSO KNOWN AS ABU
ABDULLAH AZIS, ALSO KNOWN AS COMMANDER HAIPE, ALSO
KNOWN AS HAIPE,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:00-cr-00375-1)

———

*Diane S. Lepley*, appointed by the court, argued the cause
and filed the brief for appellant.

*Chrisellen R. Kolb*, Assistant U.S. Attorney, argued the
cause for appellee. With her on the brief were *Ronald C.
Machen Jr.*, U.S. Attorney, and *Elizabeth Trosman*, *Gregg A.
Maisel*, and *Anthony Asuncion*, Assistant U.S. Attorneys.

Before: ROGERS AND KAVANAUGH, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: The defendant, Madhatta Asagal Haipe, pleaded guilty to four counts of hostage-taking in violation of 18 U.S.C. §§ 1203 and 2 and was sentenced in 2010. His conviction stems from his leadership role in a December 1995 kidnapping of 16 civilians from a recreation area in the southern Philippines, including nationals of the Philippines and the United States. A factual proffer agreed on by the parties explains that after Haipe and his associates seized the hostages, Haipe released four, demanding that they collect a ransom payment of at least 1,000,000 Filipino pesos (about $38,000 at the time) by 5 PM the next day. He instructed them not to tell the authorities about the kidnapping; if they did so, other hostages would be killed. The released hostages managed to raise over a million pesos. Despite Haipe's stricture against contacting officials, they brought a local mayor into the picture. Before any ransom was paid, she and Haipe negotiated a deal whereby Haipe accepted a lesser amount, coupled with a commitment by the mayor to provide various benefits for the local Muslim community, including financial support for existing schools and hiring more Muslims for government jobs.

Haipe's claims on appeal relate solely to sentencing, some aspects of which the plea agreement left open. His primary arguments are that the court should have applied a part of the Sentencing Guidelines that came into effect after the offense, and that the court should not have applied the so-called "terrorism enhancement," United States Sentencing Guidelines ("USSG"), § 3A1.4(a). Although the final offense level computed by the district court under the Guidelines

yielded a sentence of life imprisonment, the court sentenced Haipe to concurrent terms of 276 months in prison on each count. The court also imposed concurrent terms of 60 months supervised release.

The Guidelines are now advisory, but the first step of the sentencing court is to calculate the range they prescribe. *Gall v. United States*, 552 U.S. 38, 49, 51 (2007). Even though Haipe's ultimate sentence of 276 months fell roughly in the middle of the range his own theories would have produced (235 to 293 months), a lower range would likely have benefited him, as the properly calculated range frames the district court's exercise of its discretion. *United States v. Rodriguez*, 676 F.3d 183, 192 (D.C. Cir. 2012).

We review *de novo* Haipe's purely legal claim—that the district court should have chosen the later Guidelines. As to the application of the Guideline to the facts, 18 U.S.C. § 3742(e) directs us to give the district court "due deference," which we have said lies "somewhere between *de novo* and 'clearly erroneous.'" *United States v. Kim*, 23 F.3d 513, 517 (D.C. Cir. 1994). We find no error.

* * *

The district court is normally required to apply the Guidelines in effect at the time of sentencing. USSG § 1B1.11(a). This general rule obviously cannot trump the Constitution's *ex post facto* clause. Art. I, § 9, cl. 3. Thus, if there is a substantial risk that application of the Guidelines in effect at sentencing would result in a heavier sentence than would the Guidelines in effect at the time of the crime, the court must use the latter. *United States v. Terrell*, 696 F.3d 1257, 1260 (D.C. Cir. 2012). The Guidelines explicitly implement that principle. USSG § 1B1.11(b)(1). The principle is applicable here, as the 2010 Guidelines Manual,

thanks to a 2003 change under the PROTECT Act, Pub. L. No. 108-21, § 104, 117 Stat. 650, 653 (2003), recommended a much higher base offense level for the charged hostage-taking than did the 1995 Manual. Compare USSG § 2A4.1(a) (2010) (base offense level of 32 for kidnapping) with USSG § 2A4.1(a) (1995) (base offense level of 24 for kidnapping).

The Guidelines also direct that in applying a Guidelines Manual in effect on a particular date, the court is to apply that Manual alone, not to mix and match from Manuals of different dates. USSG § 1B1.11(b)(2). But in applying a Manual of one vintage, the court "shall consider subsequent amendments, to the extent that such amendments are clarifying rather than substantive changes." *Id*. Haipe invokes this provision. He claims that a 1996 amendment to the Guidelines' criteria for the "terrorism enhancement" was clarifying and that the district court should have considered it—notwithstanding the advantage he gained from using the 1995 Guidelines, with their relatively low, pre-2003 base offense level for kidnapping. At no point does Haipe explain how any language in the 1996 amendment could have helped him.

In any event, § 1B1.11(b)(2) limits consideration of later changes to clarifying amendments, and the 1996 change to which Haipe points is substantive. It followed a congressional directive to amend the Guidelines so that the "adjustment relating to international terrorism only applies to Federal crimes of terrorism, as defined in section 2332b(g) of title 18." Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, § 730, 110 Stat. 1214, 1303 (1996). The cross-referenced definition of "Federal crime of terrorism" lists acts that combine intimidation of government with violation of various criminal provisions, many of which apply inside as well as outside the United States, e.g., 18 U.S.C. § 37 (prohibiting violence at international airports, both within

and outside of the United States).  18 U.S.C. § 2332b(g)(5).  It represents a substantial shift in focus from 18 U.S.C. § 2331(1)(C), the definitional section cross-referenced in the 1995 Guidelines, which covered terrorist acts occurring "primarily outside the territorial jurisdiction of the United States" or transcending "national boundaries," and which contained no cross-reference to other criminal provisions. The amendment's substantive character is clear.  *United States v. Wells*, 163 F.3d 889, 899 (4th Cir. 1998); see also *United States v. Garey*, 546 F.3d 1359, 1361-62 (11th Cir. 2008); see generally *United States v. Smaw*, 22 F.3d 330, 333 (D.C. Cir. 1994).

Haipe's second major claim is that his crime did not qualify for the enhancement even under the 1995 Guidelines. Those provide for a 12-level increase if a felony "involved, or was intended to promote, international terrorism," USSG § 3A1.4 (1995).  The Guideline refers to 18 U.S.C. § 2331, which states that international terrorism means activities that:

(A) involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

(B) appear to be intended–

(i) to intimidate or coerce a civilian population;

(ii) to influence the policy of a government by intimidation or coercion; or

(iii) to affect the conduct of a government by assassination or kidnapping; and

(C) occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum . . . .

18 U.S.C. § 2331 (1994). Haipe does not dispute that his actions met parts (A) and (C) of the definition, but claims that, contrary to the finding of the district court, they were not intended, as required by subsection (B)(ii), "to influence the policy of a government by intimidation or coercion." His primary purpose, he argues with some support in the record, was to raise money for his organization. App. Br. 11.

But Haipe's money-raising goals obviously do not preclude a finding of intent to influence government policy. As the court found, he released the hostages on the condition that "the government take a host of actions to benefit the local Muslim community which included fiscal and employment policy changes," a finding fully supported by the proffer. Informing a government official that you will release hostages on the condition that an official commit to specified policy changes clearly "appear[s] to be intended" to "influence the policy of a government" by intimidation and coercion—no matter how desirable the policy changes may be.

In making the finding supporting the enhancement, the district court referred to other aspects of the kidnapping episode as well, such as Haipe's position as "a high official of an organization with a sole purpose of establishing an Islamic government." We are unsure how this and some other features mentioned by the court relate to the statutorily required intent, under subsections (B)(ii) and B(iii), to influence government policy or affect government conduct. Further, given that a kidnapping will almost by definition

intimidate the victims and will typically coerce them and their relatives or friends to pay ransom, we question whether the court's finding that "the kidnapping appeared intended to intimidate a civilian population or coercive to pay ransom money" could be thought to meet the standard of subsection (B)(i). Were it enough, every (or virtually every) kidnapping would ipso facto qualify for the terrorism enhancement. But as Haipe conceded that he conditioned the hostage release on government policy commitments, and such a bargaining stance falls squarely within the statutory language, the remoteness of some of the other factors does not require a remand.

Finally, Haipe claims that the district court erred in failing to depart downward from the Guidelines based on his incarceration before his extradition to the United States. But defense counsel acknowledged in the district court that the issue of time served was to be addressed by the Attorney General through the Bureau of Prisons. The concession accords with the prescription of 18 U.S.C. § 3585(b), as construed in *United States v. Wilson*, 503 U.S. 329 (1992).

* * *

The judgment of the district court is

*Affirmed.*