**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Michael OSTEEN, Defendant–**
**Appellant.**

**No. 00–4276.**

United States Court of Appeals,
Fourth Circuit.

Argued May 10, 2001.

Decided June 29, 2001.

ARGUED: Janet Carol Brooks, Richard A. Harpootlian, P.A., Columbia, SC, for Appellant. Jane Barrett Taylor, Assistant United States Attorney, Columbia, SC, for Appellee. ON BRIEF: Richard A. Harpootlian, Richard A. Harpootlian, P.A., Columbia, SC, for Appellant. J. Rene Josey, United States Attorney, Columbia, SC, for Appellee.

Before LUTTIG, DIANA GRIBBON MOTZ, and TRAXLER, Circuit Judges.

Affirmed by published opinion. Judge MOTZ wrote the opinion, in which Judge LUTTIG and Judge TRAXLER joined.

## OPINION

DIANA GRIBBON MOTZ, Circuit Judge:

Michael Osteen challenges his conviction on drug and gun charges, alleging violations of the Speedy Trial Act, 18 U.S.C. § 3161 (1994), the prohibition against double jeopardy, and the rule announced in the Supreme Court's recent decision in *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). Finding none of Osteen's challenges to be meritorious, we affirm.

I.

In December 1997, Captain David Florence of the Sumter County, South Carolina Narcotics Division received a telephone call from a drug agent in Johnson City, Tennessee. The agent told Captain Florence that he knew a confidential informant who was planning to return to the Sumter area, and who could arrange controlled drug buys from several people in that area, including Michael Osteen. Captain

Florence indicated that he would be interested in meeting with this informant. The informant to whom the Tennessee agent referred was David Osteen, Michael's nephew.

When David arrived in Sumter, he contacted Captain Florence as arranged, and agreed to participate in controlled buys of narcotics. Captain Florence and David Osteen entered into an agreement whereby Captain Florence would give David money to purchase drugs from designated individuals with the purpose of collecting evidence to aid in the prosecution of those individuals. To record the transactions, appropriate equipment would be placed on David's body. The agreement also provided that the Sumter County Narcotics Division would pay David for his work as an informant.

That same day, pursuant to his agreement with Captain Florence, David contacted his uncle, Michael, to inquire about purchasing methamphetamine. That night, David visited his uncle and purchased approximately three and a half grams of methamphetamine. David recorded the transaction. After purchasing the drugs, David met with Captain Florence and his partner, Officer McGee, and turned the drugs over to them.

The following day, David again met with Captain Florence to set up another controlled buy. After receiving money from Captain Florence, David went to his uncle's house where he purchased another three and a half grams of methamphetamine. As he had done the day before, David recorded the transaction and then turned over the drugs and the tape recording of the transaction to Captain Florence.

David then returned to his home in Tennessee. The next week, on Captain Florence's instructions, David called his uncle to arrange to purchase a larger amount of drugs. On December 11, David came to Michael's house, as pre-arranged, to purchase an ounce of methamphetamine. When David arrived, Michael told him that they had to wait for the "boy" to deliver the drugs. Not long thereafter, one of Osteen's co-defendants, Thomas Cockerill, arrived with the drugs, and David purchased an ounce of methamphetamine. David testified that Cockerill brought Michael an additional half of an ounce of methamphetamine, which amount Michael kept. As usual, David recorded the transaction and then met with Captain Florence to turn over the drugs and the recording of the transaction.

The following week, David again contacted Michael to set up a controlled buy, following Captain Florence's instructions. Upon his arrival in Sumter, David went to a house where Michael was doing some painting work. He intended to purchase an ounce of methamphetamine, but the amount he was given was three tenths of a gram short of an ounce. David again recorded the transaction and met with Captain Florence, as was his custom. This was the last controlled buy from Michael Osteen in which David Osteen participated.

Based on the evidence from the controlled buys, on May 20, 1998, a grand jury indicted Michael Osteen and several co-defendants on federal drug charges. On May 27, 1998, law enforcement officers arrested Michael Osteen at his home. Following his arrest, Michael gave the officers permission to search his home, an outdoor shed, and his car. In the car, the officers found several firearms. Osteen had previously been convicted of a felony drug offense and therefore was prohibited from possessing firearms.

Osteen was arraigned later that same day. Jury selection for his trial was scheduled for July 1, 1998. On June 15, Osteen filed the first of several motions to

dismiss the indictment against him. On June 30, 1998, the government moved for a continuance on the ground that the parties were engaged in plea negotiations. All parties consented in writing to the continuance, and the district court granted the motion. The negotiations were ultimately unsuccessful and on July 21, 1998, the government returned to the grand jury and obtained a superseding indictment against Osteen and his co-defendants, which added to the original indictment weapons charges based on the guns found in Osteen's car. Osteen was arraigned on the superseding indictment on August 10, 1998.

On September 4, 1998, Osteen filed a pro se motion to dismiss the indictment for violations of the Speedy Trial Act. On October 30, 1998, the district court denied the motion on the ground that Osteen's pretrial motions—which were, at that time, still pending before a magistrate judge—had tolled the seventy-day Speedy Trial Act period since June 15, 1998.

After two additional defendants were arraigned in October, jury selection was scheduled for January 7, 1999. A jury was selected on that date, but not sworn, and the trial was set for January 25, 1999. The parties were prepared to proceed on January 25, but the trial was continued due to the district judge's illness. On February 1, counsel for one of Osteen's co-defendants moved for a continuance until the next term of court, which began on February 3, because of a death in his family. The district court granted the motion and excused the previously selected jury. Due to the delay, the government permitted its primary witness, David Osteen, who had traveled to South Carolina from Tennessee to testify, to return to his home.

On February 3, 1999, the parties selected a new jury and the trial was set for February 8, 1999. The government, however, was unable to contact David Osteen before the trial was to begin. On February 8, the government moved for a continuance on the ground that David was not present. The district court denied the motion. The government then moved to dismiss, without prejudice, the drug charges until such time as David Osteen could be located. The district court granted that motion, and the parties proceeded to trial on the weapons charges only. That same day, Osteen was convicted of being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g) (Supp. II 1996).

The following day, February 9, the government attorneys located David Osteen. Knowing that its primary witness was available, the government returned to the grand jury on February 17, 1999 and sought an indictment against Michael Osteen on federal drug charges based on the same set of facts as the previous indictment. Osteen was arraigned on the drug charges on March 2, 1999. A jury was selected on April 12, and on April 26, 1999 Osteen's second trial began. He was convicted the following day of several violations of 21 U.S.C. § 841 (1994).

In the presentence report, the probation officer recommended for the § 841 violations a base offense level of 32, on the ground that Osteen was responsible for distributing at least 558.99 grams of methamphetamine. The probation officer based this calculation on the amount of drugs David purchased from Osteen during the controlled buys, and on David's testimony that, prior to purchasing methamphetamine from his uncle in his role as a government informant, he had seen his uncle with an ounce of methamphetamine on ten or twelve occasions, and with a half of an ounce on ten or twelve more occasions. Osteen objected to the amount of drugs attributed to him.

The district court held a sentencing hearing on November 10, 1999. Because the parties could not agree on the amount of drugs properly attributable to Osteen, the hearing was continued. A second hearing was held on March 30, 2000. At that hearing, the district court held Osteen responsible for 536.38 grams of methamphetamine, 68.6 grams from the controlled buys, and 467.78 grams based on David's testimony. The district court imposed a sentence of 210 months on the drug charges, and a sentence of 120 months on the weapons charge, to run concurrently. The district court also imposed a supervised release term of eight years. Osteen now appeals his convictions and sentence.

## II.

Osteen's first argument is that his right to a speedy trial under the Speedy Trial Act, 18 U.S.C. § 3161, was violated because more than seventy days elapsed between his first arraignment and each of his trials.

The Speedy Trial Act provides in relevant part:

In any case in which a plea of not guilty is entered, the trial of a defendant charged in an information or indictment with the commission of an offense shall commence within seventy days from the filing date (and making public) of the information or indictment, or from the date the defendant has appeared before a judicial officer of the court in which such charge is pending, whichever date last occurs.

18 U.S.C. § 3161(c)(1).

■ In computing the time within which a defendant's trial must commence, the statute excludes several categories of delay, including any period of "delay resulting from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other prompt disposition of, such motion." 18 U.S.C. § 3161(h)(1)(F). In other words, upon the filing of a pretrial motion, the Speedy Trial Act "clock" stops, and it does not start again until all such motions are resolved. This period is automatically excludable; delay in resolving outstanding pretrial motions need not be reasonable for this period to be excluded from the Speedy Trial Act calculation. *See United States v. Dorlouis,* 107 F.3d 248, 253–54 (4th Cir.1997).

■ In the present case, Osteen filed several pretrial motions to dismiss the indictment against him. As a result of this series of motions, the Speedy Trial Act clock did not run, with the exception of a few scattered days, from June 15, 1998 until January 5, 1999. Consequently, even under the broadest possible interpretation, fewer than seventy days—which counted towards the statutory period—elapsed between Osteen's arraignment and the commencement of his trial on the gun charges on February 3, 1999. *See United States v. A-A-A Electrical Co.,* 788 F.2d 242, 246 (4th Cir.1986) (holding that for the purposes of the Speedy Trial Act, the trial commences when voir dire begins). Thus, Osteen's trial on the gun charges did not violate the Act.

■ Nor was the Act violated with respect to his trial on the drug charges. Those charges were dismissed without prejudice on February 8, 1999; Osteen was later re-indicted on identical charges on February 17 and arraigned on those charges on March 2, 1999. When an indictment is dismissed on the government's motion, and the defendant is thereafter re-indicted on identical charges, the seventy-day Speedy Trial Act period is calculated from the date of the *first* arraignment; however, the period during which no indictment is pending is excluded from the seventy-day calculation. *See* 18 U.S.C.

§ 3161(h)(6); *see also United States v. Rojas–Contreras,* 474 U.S. 231, 239, 106 S.Ct. 555, 88 L.Ed.2d 537 (1985). Due to the exclusion of the days when Osteen's pretrial motions were pending and the exclusion of the days when no indictment was outstanding, even under the most generous calculation of the Speedy Trial Act clock, Osteen's trial on the drug charges commenced within seventy days of his original arraignment.* In sum, Osteen has failed to demonstrate a Speedy Trial Act violation.

### III.

■ Osteen also claims that the dismissal of the drug charges, and his subsequent re-indictment on identical charges, exposed him to double jeopardy because the district court dismissed the initial charges after a jury had already been selected. *See* U.S. Const. amend. V ("[N]or shall any person be subject for the same offence to be twice put in jeopardy of · life or limb."). This argument is meritless.

■ The jury that was selected on February 3, 1999 to try Osteen on the gun and drug charges was seated, but not yet sworn, when the district court granted the government's motion to dismiss the drug charges against Osteen. Under our precedent, a defendant is not placed in jeopardy when the jury is empaneled; rather, jeopardy does not attach until the moment the jury is sworn. *See, e.g., United States v. Fleming,* 667 F.2d 440, 441 (4th Cir.1981). Thus, when Osteen was later indicted and tried on drug charges identical to those contained in the dismissed counts of the

first indictment, he was *not* subjected to double jeopardy.

### IV.

Finally, Osteen challenges his sentence. His principal contention is that, under the Supreme Court's recent decision in *Apprendi,* the district court erred in enhancing his prison sentence, and in imposing a sentence of eight years of supervised release, based on an amount of drugs, which was not charged in the indictment or proved beyond a reasonable doubt to the jury. Osteen also claims that the evidence adduced at trial and at the sentencing hearing did not support the district court's finding that he was accountable for over 500 grams of methamphetamine.

■ In *Apprendi,* the Supreme Court announced a new rule of constitutional law: "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi,* 530 U.S. at 490, 120 S.Ct. 2348. Osteen's prison term of 210 months was calculated based on the district court's finding as to the amount of drugs properly attributable to Osteen. This amount, over 500 grams of methamphetamine, was not charged in the indictment nor was it submitted to the jury. Nonetheless, the sentence imposed by the district court does not violate the rule articulated in *Apprendi* because it does not exceed the prescribed statutory maximum sentence for the offense of which Osteen was convicted. Osteen had previously been convicted of a

---

* In this case, the period between February 8, 1999, when the drug charges were dismissed, and March 2, 1999, when Osteen was arraigned on the new charges, was excluded from the Speedy Trial Act clock. The clock began running again on March 3, 1999—the day after Osteen's arraignment—but it stopped on March 11, 1999, when Osteen filed yet another pretrial motion to dismiss the indictment. The clock never started again because Osteen's motion to dismiss was still pending on April 12, 1999 when a jury was selected for the trial on the drug charges.

drug offense. Assuming that the maximum sentence he could have therefore received without regard to drug amount was thirty years, *see* 21 U.S.C. § 841(b)(1)(C), his sentence of 210 months, or seventeen and a half years, is far less than that statutory maximum, and so does not run afoul of *Apprendi.*

Nor did the district court violate *Apprendi* in imposing on Osteen an eight-year term of supervised release. Section 841(b)(1)(C) provides that, without regard to drug amount, a defendant who has a prior felony conviction under that subsection is subject to a term of supervised release of *at least* six years. *See* 21 U.S.C. § 841(b)(1)(C). Put another way, six years is a statutory minimum, not a statutory maximum. *See United States v. Pratt,* 239 F.3d 640, 647–48 (4th Cir.2001). Thus, the term of supervised release imposed by the district court, eight years, does not exceed the statutory maximum term—because there is no statutory maximum term of supervised release—and therefore cannot violate the rule announced in *Apprendi.*

Finally, the government presented sufficient evidence—namely, David Osteen's testimony—to justify the district court's finding that Michael Osteen was responsible for more than 500 grams of methamphetamine. We will reverse a district court's determination of the amount of drugs attributable to a defendant *only* when this determination is clearly erroneous. *See United States v. Lopez,* 219 F.3d 343, 348 (4th Cir.2000). We do not find such error here.

The district court made a specific finding that David Osteen's testimony was credible and thus the court was entitled to rely on David's testimony regarding the amount of drugs he had seen in his uncle's possession. *See United States v. Gilliam,* 987 F.2d 1009, 1013 (4th Cir.1993) (the Government may meet its burden of prov-ing the quantity of drugs for which a defendant should be held accountable at sentencing by presenting evidence that the court deems sufficient to establish the quantity of drugs attributable to a defendant). At trial, David made a conservative estimate that, prior to the controlled buys that were the subject of the indictment, he had seen his uncle in possession of an ounce of methamphetamine on ten to twelve occasions and in possession of a half of an ounce on another ten to twelve occasions. Taking all of the evidence adduced at trial into account, the district court estimated that Osteen had been in possession of an ounce of methamphetamine on eleven occasions, and in possession of half an ounce on eleven other occasions. This estimate is well within the range permitted by David Osteen's testimony and therefore not clearly erroneous. *See United States v. Randall,* 171 F.3d 195, 210–11 (4th Cir. 1999) (holding that a precise calculation of drug quantity is not required and that a district court's approximation of the amount of drugs is not clearly erroneous if supported by competent evidence in the record). Consequently, the district court's determination of the amount of drugs attributable to Osteen must stand.

## V.

For the foregoing reasons, the judgment of the district court is hereby

*AFFIRMED.*