PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellant,*

v.                                        No. 07-4551

NANCY JEAN SIEGEL,
          *Defendant-Appellee.*

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
Andre M. Davis, District Judge.
(1:03-cr-00393-AMD)

Argued: May 15, 2008

Decided: August 12, 2008

Before TRAXLER and KING, Circuit Judges, and
Jackson L. KISER, Senior United States District Judge
for the Western District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Traxler wrote the majority opinion, in which Judge King joined. Senior Judge Kiser wrote an opinion concurring in part and dissenting in part.

## COUNSEL

**ARGUED:** Christine Manuelian, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant. Andrew David Levy, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland, for Appellee. **ON BRIEF:** Rod J. Rosenstein, United

States Attorney, Tamera Fine, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellant. Jane R. Flanagan, BROWN, GOLDSTEIN & LEVY, LLP, Baltimore, Maryland; Thomas J. Saunders, Baltimore, Maryland, for Appellee.

---

**OPINION**

TRAXLER, Circuit Judge:

Nancy Jean Siegel is currently under indictment for numerous fraud-based offenses, including mail and wire fraud, *see* 18 U.S.C.A. §§ 1341 & 1343 (West 2000 & Supp. 2008). Siegel also faces a charge of committing murder to prevent the reporting of her crimes. *See* 18 U.S.C.A. § 1512(a)(1)(C) (West 2000 & Supp. 2008). A week before her trial was scheduled to commence, the district court granted Siegel's motion to strike as surplusage allegations in the indictment about certain crimes that were not the subject of a substantive criminal count and her motion to preclude the government from introducing in its case-in-chief evidence about those crimes and other crimes not mentioned in the indictment. The government appeals. We reverse the district court's decisions and remand for trial.

I.

A.

The allegations in the indictment against Siegel and the evidence forecast by the government in its pre-trial filings establish the following.[1] Siegel married Charles Kucharski in 1968, and the couple divorced in 1985. Sometime towards the end of the marriage, Siegel began gambling. To support her gambling habit, Siegel used Kucharski's name and personal information to obtain credit without Kuchar-

---

[1]Because this is a pre-trial appeal, our review of the facts is by necessity limited to the facts the government intends to prove at trial as evidenced by the allegations of the indictment and the evidence proffered by the government in the course of the pre-trial proceedings.

ski's knowledge. Siegel's actions left Kucharski more than $100,000 in debt, and he was forced to file for bankruptcy a few years after the couple divorced.

Siegel married Ted Giesendaffer in 1985. She apparently continued to gamble and continued to support her gambling habit by engaging in the same kind of fraudulent conduct she began in her first marriage. Siegel used Giesendaffer's personal information to obtain credit, and she stole money from him by altering mortgage-payment checks to make them payable to her instead of the mortgage company. When Giesendaffer discovered Siegel's misconduct, he confronted her about it and threatened to go to the police. Siegel responded to that threat with such violence that Giesendaffer hid from her in a closet. Siegel and Giesendaffer separated in February 1992 and divorced in 1993.

In 1992, Siegel convinced her friends John and Linda Mayberry to co-sign a car loan and pay the required down-payment. Not surprisingly, Siegel defaulted on the car loan, and the Mayberrys ended up repaying the loan. Siegel subsequently used John Mayberry's personal information to obtain a $3,000 loan in his name.

In December 1992, Siegel stole the wallet of Merle Beckman. She used Beckman's credit cards until they were cancelled, and she managed to convince bank employees to give her the number of the account connected to Beckman's ATM card. Siegel ultimately stole thousands of dollars from Beckman. In January 1993, Siegel stole the wallet of Burdell Dowdell. She wrote checks payable to "Charlene Townsend" on Dowdell's account and then posed as Townsend to cash the checks. In February 1993, Siegel stole the wallet of Leslie Wallace, whose daughter was in dance class with Siegel's daughter. Siegel immediately began draining the funds from Wallace's bank accounts. Wallace changed her account number twice, but Siegel managed to convince bank employees to give her the new account numbers over the telephone. Siegel also convinced bank employees to make a large amount of cash available to her at the drive-through window.[2] Bank employees eventually caught on, and Siegel was

---

[2]Claiming to be Wallace, Siegel told the employees that she was being treated for cancer and had forgotten her account number because the chemotherapy affected her memory. She also claimed that the chemotherapy prevented her from entering the bank, so bank employees let her pick up a large amount of money through the drive-through window.

finally arrested after making another pick-up at the drive-through window.

Siegel pleaded guilty in Maryland state court to charges stemming from the Dowdell, Wallace, and Beckman wallet thefts. In December 1994, after pleading guilty but before being sentenced, Siegel stole the wallet of co-worker Cynthia Kidwell. Although Kidwell did not keep credit cards or checks in her wallet, the wallet did contain Kidwell's driver's license. Siegel put her own picture on the license and then used the license to take out loans in Kidwell's name. After the fraud was uncovered and Kidwell identified Siegel as a co-worker, Kidwell recalled seeing Siegel on several occasions parked near Kidwell's home, presumably waiting to intercept mail connected to the fraudulent loans. Siegel pleaded guilty to state charges stemming from the Kidwell theft, and she ultimately received suspended sentences and probation for each of the wallet thefts.

In 1994, while she was on probation for the wallet-theft crimes, Siegel met Jack Watkins, a widower almost thirty years her senior. Watkins lived on Sungold Road in Reisterstown, Maryland. He supported himself comfortably in his retirement through Social Security benefits and annuity payments from New York Life. Before he met Siegel, Watkins had a few credit cards that he used sparingly, and he always paid the full balance when he did make a credit card purchase. He owned his home outright, with no mortgage or other encumbrance.

Watkins and Siegel met in the fall of 1994, when she sold him a burial vault, and the relationship quickly became close. From all appearances, the relationship was a romantic one. Within months after meeting Watkins, Siegel began using his personal information to open new accounts, generally using her own address in Ellicott City, Maryland, as the address on the accounts. By December 1994, Siegel had changed the address on many of Watkins's pre-existing accounts to her Ellicott City address. She made extensive charges on those accounts and allowed the accounts to become delinquent. In May 1995, Siegel persuaded Watkins to buy her a new, $44,000 BMW. The financing for the car was in Watkins's name, and the car was titled and insured under Watkins's name, but Siegel was the car's only driver.

Sometime in 1995, while Siegel was still on probation, the Mayberrys (who Siegel had previously left holding the bag on a car loan) learned about the $3,000 loan Siegel had taken out in John Mayberry's name. Mayberry repeatedly confronted Siegel about the loan, until she finally repaid him. Around this same time, Siegel approached Jack Butcher, an acquaintance. Siegel cried as she told him that she would go to jail unless she could come up with $3,000. Butcher borrowed the money and gave it to Siegel, on the condition that she repay the loan herself. Siegel of course defaulted on the loan, and she later tried to use Butcher's personal information to obtain another loan. Butcher found out about her efforts and cancelled the loan. When he confronted her and threatened to go to the police, Siegel became hysterical. She eventually managed to repay the $3,000 loan.

By August 1995, Siegel had accumulated tens of thousands of dollars of debt on credit cards in Watkins's name, and the balance on the car loan exceeded $40,000. At Siegel's urging, Watkins obtained a $44,000 mortgage on his home on August 22, 1995. Siegel used the mortgage proceeds to pay off credit card debt, but then promptly began making new charges. By November 1995, Siegel convinced Watkins to re-finance the mortgage on his home. She persuaded him to give her the balance of the mortgage proceeds (approximately $20,000 after the August mortgage was satisfied) so she could buy the condominium she lived in. Siegel's condominium unit, however, was not for sale, and Siegel used the mortgage proceeds for other purposes.

Siegel apparently exerted as much control over Watkins's personal life as she did over his financial life. Before meeting Siegel, Watkins had breakfast several times a week with a group of friends, and he had regular contact with stepchildren from a prior marriage. After he met Siegel, however, he began meeting his breakfast group less and less frequently. Siegel eventually drove him to one final breakfast where he said goodbye to his friends. Telephone calls to Watkins from his stepchildren were forwarded to Siegel's telephone, but Watkins never knew about the calls. Before losing contact, Watkins had told his stepchildren, breakfast friends, and a neighbor about his relationship with Siegel. He told them that he and Siegel would be getting married and that he would move into her condominium.

In February 1996, Siegel contacted a real estate company to inquire about the company buying Watkins's home. In the first week of April 1996, Siegel pawned most of Watkins's personal possessions. The company Siegel had contacted bought Watkins's home on April 9, 1996. By the time of the sale, the November mortgage was already several months in arrears. Watkins netted just over $3,800 from the sale of his home, "a home he had owned free and clear before meeting Siegel." Brief of Appellant at 14.

After selling the house, Watkins and Siegel went to Atlantic City to celebrate their upcoming marriage. Watkins apparently drank heavily in Atlantic City, and Siegel took him to an emergency room when they returned to Maryland. Watkins was admitted to the hospital. Watkins told hospital staff that Siegel was his fiancée, but Siegel told the staff that she was simply his caregiver or housekeeper, not his fiancée. Although Watkins was oriented in time, place, and person, and appeared to hospital staff to be sensitive and responsive, he was diagnosed as suffering from dementia, given his insistence in the face of her denial that he was engaged to Siegel. Watkins was then transferred to the psychiatric ward. Hospital records indicate that Siegel did not want Watkins to be discharged into her care and that she tried to have him placed in a long-term care facility. She was unable to find a facility with an immediate opening, and she took Watkins to her condominium when he was discharged on April 16, 1996.

On May 14, 1996, Watkins's emaciated body was found near an access point to the Appalachian Trail in Loudoun, Virginia. The body was stuffed inside two duffle bags and then stuffed into a footlocker. The cause of death was cervical compression, and there were bruises and other marks on the body that were consistent with manual strangulation. A toxicology analysis revealed that Watkins's blood and liver contained toxic levels of an over-the-counter medication with sedative effects, which suggested that Watkins had been ingesting extremely high levels of the medication for a period of weeks or months. Although Watkins's body was found within days after his death, the police were unable to identify the body. Siegel never reported him missing, and because Watkins had lost contact with his friends and family, no one else even knew that he had disappeared.

Siegel continued to use Watkins's identity well after his death. She stopped the direct deposit of his Social Security checks, had the

checks mailed to her address (and later a post office box) in Ellicott City, and deposited the checks in various bank accounts to which she had access. Siegel continued to receive Watkins's annuity payments, and she opened new credit card accounts in Watkins's name several years after his death.

Siegel had dated Eric Siegel, a wealthy commercial loan broker, for a time in 1992. The relationship resumed in fits and starts in May or June 1995, while Siegel was still involved with Watkins. By June 1996, shortly after Watkins's death, the relationship was again in full flower, and Siegel and Eric married in December 1998. Not surprisingly, Siegel did not spare Eric from her fraudulent schemes. She stole money directly from his financial accounts and incurred substantial debt in his name through credit accounts and loans about which Eric had no knowledge. When Siegel's actions came to light, Eric chose to make good on her debts (which amounted to about $300,000) rather than report Siegel to the police.

Siegel's own daughters also became victims of her crimes. Siegel took money that her daughter Jennifer had given her to make car payments, and Jennifer's car eventually was repossessed. Siegel used Jennifer's identity and that of her daughter Amanda to open credit accounts and then defaulted on those accounts, thus destroying her daughters' credit ratings. Siegel sometimes used her daughters' identities and bank accounts when cashing Watkins's Social Security checks and annuity payments in the years after his death.

In January 2003, nearly seven years after Watkins was murdered, Virginia law enforcement officials identified his body through military fingerprint records. The Virginia officials sought help from investigators with the Social Security Administration, who quickly determined that Siegel had been receiving Watkins's Social Security checks since his death.

After a few months of investigating and watching Siegel, postal inspectors and an FBI agent approached Siegel after she had retrieved Watkins's Social Security check from her post office box. She agreed to be interviewed. Siegel initially claimed that Watkins was alive and well, living in Pennsylvania with a woman named Ruth. She said that before moving to Pennsylvania some six years earlier, Watkins had

lived with her for about eight months after selling his house. Siegel said that she cashed Watkins's checks for him because he was a gambler and had financial problems that made it impossible for him to have a checking account. The investigators finally told Siegel that they knew what had happened to Watkins. While Siegel repeatedly told the investigators that she wanted to tell them everything, she never provided them with any details about Watkins's death, except to say that "[i]t didn't happen the way you think." J.A. 103. Siegel later told family members that she came home one afternoon and found Watkins sprawled across the bed with a cord around his neck.

B.

The government indicted Siegel in 2004, charging her with seven counts of converting Jack Watkins's Social Security checks, *see* 18 U.S.C.A. § 641 (West Supp. 2008); six counts of bank fraud, *see* 18 U.S.C.A. § 1344 (West 2000); one count of identity theft, *see* 18 U.S.C.A. § 1028 (West 2000 & Supp. 2008); two counts of mail fraud, *see* 18 U.S.C.A. § 1341; and two counts of wire fraud, *see* 18 U.S.C.A. § 1343. The government also charged Siegel with murdering Watkins to prevent him from reporting her fraud, *see* 18 U.S.C.A. § 1512(a)(1)(C); and with impeding an official investigation by transporting Watkins's body across state lines, *see* 18 U.S.C.A. § 1512(c)(2) (West Supp. 2008).

Although the substantive criminal charges were all premised on conduct involving Jack Watkins, the indictment alleged as part of Siegel's "scheme and artifice to defraud" Siegel's misconduct involving her three husbands, her daughters, the Mayberrys, and Jack Butcher. And while the indictment did not include allegations about the wallet thefts that led to Siegel's state-court convictions and probationary sentences, the government before trial filed a motion notifying Siegel of the wallet-theft evidence and seeking permission to present that evidence at trial.[3] Siegel filed a motion in limine seeking to preclude

---

[3]We will refer to the evidence of fraud involving victims other than Jack Watkins as the "Other Crime Evidence." When necessary for clarity, we will refer to the Other Crime Evidence that was alleged in the indictment as the "Charged Other Crime Evidence," and the Other Crime Evidence that was not mentioned in the indictment as the "Uncharged Other Crime Evidence."

the government from presenting at trial any of the Other Crime Evidence, and Siegel also sought to strike as surplusage the allegations in the indictment about the Charged Other Crime Evidence.

A week before Siegel's trial was scheduled to begin, the district court held a hearing to consider the pending motions. Counsel for Siegel argued that the Other Crime Evidence was inadmissible character evidence, *see* Fed. R. Evid. 404(a), and counsel argued that the government could not avoid Rule 404 by including allegations of the Charged Other Crime Evidence in the indictment. Counsel for Siegel therefore argued that the allegations of the Charged Other Crime Evidence should be stricken from the indictment and that the government should be precluded from presenting at trial any of the Other Crime Evidence.

The government argued that the mail and wire fraud statutes under which Siegel was charged required proof of a "scheme or artifice to defraud." The government contended that Siegel had a single, twenty-year long scheme to defraud various victims. The government argued that it was entitled to include in the indictment allegations setting forth the full scope of that scheme, including the allegations of the Charged Other Crime Evidence, regardless of whether the conduct set forth in those allegations was the subject of substantive criminal counts. As for the Uncharged Other Crime Evidence, the government contended that those crimes were an intrinsic part of the indicted scheme to defraud and that the Uncharged Other Crime Evidence was therefore admissible. Alternatively, the government contended that the Other Crime Evidence was relevant to establish, among other things, Siegel's motive for killing Watkins and that the Other Crime Evidence was therefore admissible under Rule 404(b).

The district court granted Siegel's motions, at least for purposes of opening statements and the government's case-in-chief. The court concluded that the Other Crime Evidence would be offered to prove Siegel's propensity to commit fraud and that introduction of the evidence was therefore prohibited by Rule 404(b). As for the Charged Other Crime Evidence, the court concluded that because the evidence was not admissible, the allegations in the indictment about that misconduct should be stricken as surplusage.

The district court explained that while the Other Crime Evidence might be "relevant in a very expansive way," J.A. 424, the evidence of Siegel's defrauding of her husbands and daughters "and all the things that occurred prior to the 1993-94 period . . . . is inflammatory, unduly prejudicial, is certain to give rise to a waste of time, [and] it is cumulative and its probative value is significantly outweighed by its . . . unfair prejudicial effect." J.A. 424-25. The court expressed its view that "the case that should have been indicted is the murder case involving Mr. Watkins and the related defrauding of Mr. Watkins and the banks, insurance company and the Social Security Administration thefts, [and] that's the case we're going to try." J.A. 426.

It appears that the court's ruling was at least partially driven by the court's concern about the length of trial. The court suggested that Siegel's husbands and children might feel some amount of guilt, because they effectively enabled Siegel's crimes by not going to the police before Watkins was murdered. The court stated that if Siegel's family

> had been less loving, less forgiving, less understanding . . . , maybe we wouldn't be here today in federal court in a murder case. This case is not the place with all respect for those persons to expiate their differences. This is not the forum for that. . . . I go down this path just to point out why it clearly would be very likely an enormous waste of time to permit ex-husbands to come in here over the course of days and days and days of what I understand is likely to be hours and hours of testimony . . . . Clearly, we open up the whole panoply of issues relating to the defendant's state of mind, her mental health, his knowledge of it. Was he protecting her for this reason or that reason or some other reason? And the same thing can be said about the other husbands, ex-husbands. Same thing can be said about the daughters. It's not a family law case. It's a murder case.

J.A. 427-28.

Believing that the district court's rulings severely hampered its ability to prove the charges against Siegel, the government filed this interlocutory appeal.

## II.

We first consider Siegel's claim that we lack jurisdiction over the government's appeal. The government's right to appeal an adverse ruling in a criminal case is controlled by 18 U.S.C.A. § 3731 (West Supp. 2008). Section 3731 authorizes the government to appeal an order

> suppressing or excluding evidence or requiring the return of seized property in a criminal proceeding, not made after the defendant has been put in jeopardy and before the verdict or finding on an indictment or information.

*Id.*[4] Siegel argues that the district court's decision was a preliminary ruling only and thus did not actually have the effect of suppressing or excluding evidence. Siegel therefore contends that the district court's order is not appealable under § 3731. We disagree.

As Siegel points out, the district court repeatedly indicated that its rulings were preliminary and could change as the trial progressed. *See, e.g.*, J.A. 423 (indicating that the district court would "wait until [it] hears the evidence so as to make a better informed, more reasonable decision about what really is surplusage and what is not"); J.A. 426-27 ("Now with respect to what the Government describes as the uncharged conduct, the Court does not intend at this time to admit any of such evidence. . . . [D]epending on how things go, I'm not foreclosing the Government from persuading me. I seriously doubt the Government will persuade me. But I'm not totally foreclosing the possibility that the Government will persuade me to admit evidence of . . . no more than one . . . of the wallet theft incidents."). The district court's order, however, while described as preliminary, precluded the government from referring to any of the Other Crime Evidence in opening statements and from presenting any of that evidence during its case-in-chief. Moreover, the district court made it

---

[4]Section 3731 also requires the United States attorney to certify to the district court "that the appeal is not taken for purpose of delay and that the evidence is a substantial proof of a fact material in the proceeding." The government has complied with the certification requirement in this case.

clear that it would reconsider the issue only *after* the close of the government's case-in-chief. By that point in the trial, however, jeopardy would have long since attached, *see, e.g.*, *United States v. Osteen*, 254 F.3d 521, 526 (4th Cir. 2001), and the government would be statutorily prohibited from pursuing an appeal. *See* 18 U.S.C.A. § 3731 (permitting appeal of orders excluding evidence only if the order was "not made after the defendant has been put in jeopardy").

Section 3731 was enacted "to remove all statutory barriers to Government appeals and to allow appeals whenever the Constitution would permit," *United States v. Wilson*, 420 U.S. 332, 337 (1975), and the statute by its own terms must be "liberally construed to effectuate its purposes." 18 U.S.C.A. § 3731. Because no jury has been sworn in this case, the Double Jeopardy clause clearly does not preclude the government's appeal. And the district court's ruling without question prevents the government from presenting in its case-in-chief substantial evidence establishing a significant portion of the fraudulent scheme alleged by the government in the indictment. Even if the district court reconsidered the issue, the court stated that it would at most permit the government to present evidence of *one* of the wallet thefts. The district court's decision, though couched in preliminary terms, therefore effectively and finally suppressed a large portion of the evidence the government intended to present at trial. Under these circumstances, we have no difficulty concluding that the government's appeal of the district court's rulings is authorized by § 3731. To conclude otherwise would insulate the district court's ruling from appellate review, thus frustrating rather than furthering the purposes of § 3731. *See United States v. Horwitz*, 622 F.2d 1101, 1104-05 (2d Cir. 1980) (permitting government to appeal district court's conditional ruling that testimony of government witnesses would be suppressed unless the government also granted immunity to certain defense witnesses, which the government insisted it would not do: "[I]f the judge's decision to suppress evidence is incorrect and a judgment of acquittal results, principles of double jeopardy will prevent a government appeal, a situation which section 3731 was designed to prevent. Under the circumstances, it would be an exercise in pure formalism to hold that the district court's order is not appealable at this juncture."); *United States v. Helstoski*, 576 F.2d 511, 521 (3d Cir. 1978) ("Section 3731 was designed to allow appeals . . . to insure that

prosecutions are not unduly restricted by erroneous pre-trial decisions to exclude evidence."), *aff'd*, 442 U.S. 477 (1979).

## III.

We turn now to the government's contention that the district court erred by excluding the Other Crime Evidence. Under the Federal Rules of Evidence, "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Fed. R. Evid. 404(b). Such evidence, however, may "be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* The Rule 404(b) inquiry applies only to evidence of other acts that are "extrinsic to the one charged." *United States v. Chin*, 83 F.3d 83, 87 (4th Cir. 1996). "[A]cts intrinsic to the alleged crime do not fall under Rule 404(b)'s limitations on admissible evidence." *Id.* at 87-88.

The government argues that the Other Crime Evidence involves crimes that were part of Siegel's twenty-year scheme to support her gambling habit by defrauding anyone available, be it family or friends. The government contends that the conduct described by the Other Crime Evidence was intrinsic to the charged crimes and that the Other Crime Evidence therefore is not subject to the limitations of Rule 404(b). And even if the Other Crime Evidence involved crimes that should be viewed as extrinsic to the charged crimes, the government argues that the evidence was nonetheless admissible under Rule 404(b).

Siegel, however, contends that fraudulent acts committed (in some instances years) before she even met Jack Watkins and involving victims with no connection to Watkins cannot be considered intrinsic to the Watkins-related crimes charged in the indictment. Siegel insists that the Other Crime Evidence was offered solely to show her bad character and her propensity to commit fraud and that the district court therefore properly excluded the evidence under Rule 404(b).

## A.

Evidence of uncharged conduct is not "other crimes" evidence subject to Rule 404 if the uncharged conduct "arose out of the same

series of transactions as the charged offense, or if [evidence of the uncharged conduct] is necessary to complete the story of the crime on trial." *United States v. Kennedy*, 32 F.3d 876, 885 (4th Cir. 1994) (internal quotation marks and alterations omitted); *see also Chin*, 83 F.3d at 88 ("Other criminal acts are intrinsic when they are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." (internal quotation marks omitted)).

In our view, at least some of the conduct underlying the Other Crime Evidence is properly viewed as intrinsic to the Watkins-related counts with which Siegel was charged. For example, evidence of Siegel's crimes against Eric Siegel, and the scope of those crimes, would provide important context for the government's charge that Siegel murdered Watkins to prevent him from discovering and reporting her crimes. By the time Siegel had exhausted Watkins's financial resources, she had already re-established her relationship with Eric, her future husband. Eric's wealth made him a much more attractive target for Siegel's attentions, so she needed to find a way to end her relationship with Watkins that would not jeopardize her freedom or her access to Eric's financial resources. If Siegel had simply walked away from Watkins in order to pursue her relationship with Eric, Watkins—who no longer had his own place to live (or any personal possessions, for that matter)—would have had little choice but to turn to his long-neglected friends or family for help. His family and friends would almost certainly have discovered and explained to Watkins what Siegel had done to him, which would have placed Siegel at great risk. Siegel had already failed in her efforts to have Watkins institutionalized, and it surely would have been difficult for Siegel to pull off a marriage to Eric if she were living with another man. Evidence of her crimes against Eric would thus provide the jury with the necessary context for the government's claim that Siegel murdered Watkins so that she could safely move forward in her relationship with Eric. *See United States v. Cooper*, 482 F.3d 658, 663 (4th Cir. 2007) (explaining that evidence of bad acts that "provide[s] context relevant to the criminal charges" is admissible without consideration of the requirements of Rule 404); *United States v. Lipford*, 203 F.3d 259, 268 (4th Cir. 2000) (evidence of other criminal acts admissible without regard to Rule 404(b) where the evidence "served to complete the story" of the charged crimes).

For similar reasons, the wallet thefts to which Siegel pleaded guilty in state court are also properly viewed as intrinsic to the Watkins-related crimes. Siegel was still on probation for these crimes when Watkins was killed. Thus, Siegel's relationship with Eric *and* her personal freedom depended on her ability to extricate herself from the relationship with Watkins without him discovering and reporting her crimes.

We are not certain, however, that *all* of the Other Crime Evidence involves conduct that can be viewed as intrinsic to the crimes with which Siegel was charged. For example, it is not apparent that Siegel's defrauding of the Mayberrys and Jack Butcher were inextricably intertwined with her defrauding of Watkins, and her conduct with regard to Butcher and the Mayberrys does not at first blush seem to provide relevant context for any of the Watkins-related crimes with which Siegel was charged. We need not, however, definitively determine whether each piece of the Other Crime Evidence may be viewed as intrinsic to the crimes for which Siegel has been indicted. As we explain below, we conclude that the Other Crime Evidence is admissible under Rule 404(b), which makes further inquiry into the intrinsic-extrinsic divide unnecessary.

## B.

"Rule 404(b) prohibits evidence of other crimes or bad acts to show bad character or propensity to break the law." *United States v. Young*, 248 F.3d 260, 271 (4th Cir. 2001). Evidence of other crimes nonetheless is

> admissible for other purposes, which include, but are not limited to, proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Rule 404(b) is viewed as an inclusive rule, admitting all evidence of other crimes or acts except that which tends to prove *only* criminal disposition.

*Id.* (emphasis added; citations and internal quotation marks omitted). To be admissible under Rule 404(b), evidence must be "(1) relevant to an issue other than character; (2) necessary; and (3) reliable." *United States v. Wells*, 163 F.3d 889, 895 (4th Cir. 1998) (internal

quotation marks omitted); *see also United States v. Queen*, 132 F.3d 991, 997 (4th Cir. 1997).

We agree with the government that the Other Crime Evidence was relevant to issues other than Siegel's bad character. The Other Crime Evidence is most directly relevant to establishing Siegel's motive for killing Jack Watkins. The government charged Siegel under 18 U.S.C.A. § 1512(a)(1)(C), which required the government to prove not only that she killed Watkins, but that she killed him for the purpose of preventing him or anyone else from providing law enforcement with information about the federal crimes she had committed. The Other Crime Evidence showed that Siegel had an extensive history of fraud that inflicted significant financial losses on numerous victims. Given the scope of her fraudulent conduct, Siegel would likely face a lengthy prison term and substantial restitution obligations if she were caught. The Other Crime Evidence would thus give a jury a basis for concluding that Siegel had a very strong interest in keeping Watkins quiet. *See United States v. Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988) (in case where the defendants were charged with obstruction of justice, evidence of defendants' participation in a robbery was admissible under Rule 404(b) because it was "highly probative of their motive, and the intensity of that motive, to seek to prevent certain witnesses from testifying at their trial for robbery"). Accordingly, because the Other Crime Evidence established the extent of Siegel's fraudulent scheme and explained her motive for killing Watkins, the Other Crime Evidence was relevant to an issue other than Siegel's character.

The Other Crime Evidence likewise tended to show Siegel's *modus operandi*: Her typical pattern was to obtain the personal information of another person, use that information to obtain credit in that person's name, and take whatever steps were necessary to prevent that person from learning about the new accounts until it was too late. She engaged in that pattern when defrauding each of her husbands, her daughters, the Mayberrys, Jack Butcher, and, of course, Jack Watkins. Because the Other Crime Evidence established a *modus operandi*, it is admissible under Rule 404(b). *See United States v. Tanner*, 61 F.3d 231, 237 (4th Cir. 1995); *see also Queen*, 132 F.3d at 997 (explaining that "the more similar the prior act is (in terms of physical similarity

or mental state) to the act being proved, the more relevant it becomes" for purposes of Rule 404(b)).

We likewise conclude that the components of the Other Crime Evidence are individually relevant to issues other than character. Siegel told federal investigators that Watkins had a gambling problem that led to his financial difficulties, which suggests that Siegel may claim at trial that Watkins lost his house and other assets not because she stole them, but because of his gambling problem. Such a defense would undercut the government's theory of the case and its explanation of her motive for killing Watkins. The evidence that Siegel started gambling while married to her first husband and began to steal money from him to cover her losses would therefore be admissible as evidence of Siegel's motive.

The evidence of the wallet thefts showed that Siegel was in real danger of going to jail if arrested again, given that she was still on probation for those crimes when Watkins was killed. The evidence that John Mayberry repeatedly confronted Siegel about repayment of a $3,000 loan and that Siegel repaid Mayberry around the same time that she induced Butcher to provide her with that precise amount of money indicates that Siegel's house of cards was on the verge of collapsing, thus magnifying the possibility that her probation would be revoked. The evidence that Siegel became violent when her second husband threatened to go to the police again shows the depth of Siegel's fear of going to jail. The evidence showing that Siegel defrauded her own daughters and her husbands tends to show the hold that gambling had on Siegel and tends to refute any suggestion that Watkins knew about the accounts she opened in his name. *Cf. Queen*, 132 F.3d at 997 ("the more similar the prior act is . . . to the act being proved, the more relevant it becomes" for purposes of Rule 404(b)). Finally, for the reasons discussed previously, the evidence of Siegel's defrauding of Eric helps establish Siegel's motive for killing Watkins.

Because Siegel had been defrauding multiple victims for at least twenty years and had never previously taken such extreme action, it is particularly important for the government to be able to explain to the jury why it was suddenly necessary for Siegel to resort to murder. Accordingly, we conclude that the Other Crime Evidence, individually and as a whole, was relevant to issues other than Siegel's charac-

ter or propensity to commit fraud. *See United States v. Aramony*, 88 F.3d 1369, 1377 (4th Cir. 1996) ("To be relevant, evidence need only to have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (internal quotation marks omitted)).

The Other Crime Evidence was also necessary within the meaning of our Rule 404(b) jurisprudence. *See Wells*, 163 F.3d at 895. For purposes of Rule 404(b), evidence of other crimes or bad acts is necessary if it is "an essential part of the crimes on trial, or where it furnishes part of the context of the crime." *Queen*, 132 F.3d at 998 (internal quotation marks omitted)). As explained above, the § 1512 charge requires the government to prove that Siegel killed Watkins for the purpose of preventing her crimes from being reported to the police. As we have explained, the Other Crime Evidence is important to establishing Siegel's motive, an essential element of the § 1512 charge. The Other Crime Evidence was therefore necessary for purposes of Rule 404(b).

The final requirement for admissibility under Rule 404(b)—that the evidence of other crimes be reliable, *see Wells*, 163 F.3d at 895—is likewise satisfied in this case. Evidence is reliable for purposes of Rule 404(b) "unless it is so preposterous that it could not be believed by a rational and properly instructed juror." *Aramony*, 88 F.3d at 1378 (internal quotation marks omitted). Although the Other Crime Evidence shows that Siegel was willing to go to shocking lengths to get the money she needed to fuel her gambling addiction, it is in no sense preposterous or unbelievable.

Accordingly, we conclude that the Other Crime Evidence satisfies the requirements for admissibility established by Rule 404(b).

C.

Evidence sought to be admitted under Rule 404(b) must also satisfy Rule 403's requirement that the probative value of the evidence must not be "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations

of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403; *see Queen*, 132 F.3d at 997.

Although the district court indicated that the Other Crime Evidence should be excluded under Rule 403 as unfairly prejudicial, the court did not explain why it found the evidence to be unfairly prejudicial. After considering the record before us, we find nothing to support the district court's determination on this issue.

The Other Crime Evidence is certainly prejudicial to Siegel's case, "just as all evidence suggesting guilt is prejudicial to a defendant." *United States v. Williams*, 445 F.3d 724, 730 (4th Cir. 2006). That kind of general prejudice, however, is not enough to warrant exclusion of otherwise relevant, admissible evidence. Evidence may be excluded under Rule 403 only if the evidence is *unfairly* prejudicial and, even then, only if the unfair prejudice *substantially* outweighs the probative value of the evidence. *See id.* "Evidence is unfairly prejudicial and thus should be excluded under Rule 403 when there is a genuine risk that the emotions of a jury will be excited to irrational behavior, and this risk is disproportionate to the probative value of the offered evidence." *Id.* at 730 (internal quotation marks and alteration omitted). Because the Other Crime Evidence describes fraudulent conduct that is substantially similar to the conduct that Siegel engaged in while defrauding Jack Watkins, we cannot conclude that introduction of the Other Crime Evidence would create a substantial risk that jurors would be excited to irrational behavior. Under these circumstances, we conclude that the district court abused its discretion by determining that Rule 403 required exclusion of the Other Crime Evidence. *See United States v. Kelly*, 510 F.3d 433, 437 (4th Cir. 2007) ("[W]e defer to the district court's Rule 403 balancing . . . unless it is an arbitrary or irrational exercise of discretion" (internal quotation marks omitted)), *cert. denied*, 128 S. Ct. 1917 (2008); *Aramony*, 88 F.3d at 1378 ("Because the evidence sought to be excluded under Rule 403 is concededly probative, the balance under Rule 403 should be struck in favor of admissibility, and evidence should be excluded only sparingly.").

The district court's decision to exclude the Other Crime Evidence was also grounded in the court's concern about the length of time it would take to present the evidence. *See* J.A. 428 ("I go down this path

just to point out why it clearly would be very likely an enormous waste of time to permit ex-husbands to come in here over the course of days and days and days of what I understand is likely to be hours and hours of testimony. . . ."). A district court is, of course, vested with broad authority to control the manner of trial and the presentation of evidence. *See United States v. Janati*, 374 F.3d 263, 273 (4th Cir. 2004) ("The scope of the district court's discretion to manage trials before it is and must be particularly broad."); *see also* Fed. R. Evid. 611. Nevertheless, "[s]ubject to the district court's reasonable management of cases brought to the court for trial, the government too has broad discretion to prosecute crimes." *Janati*, 374 F.3d at 274.

Although we sympathize with the district court's concern about the length and complexity of the trial, we agree with the government that the district court excluded the Other Crime Evidence without sufficiently considering the importance of the evidence to the government's case. While the government could easily prove the fraud and identity theft charges against Siegel without the Other Crime Evidence, the § 1512(a)(1)(C) charge, as we have previously discussed, requires the government to prove that Siegel killed Watkins *for the purpose* of preventing Watkins or others from giving law enforcement officials information about federal crimes she had committed. Intent is often a difficult element to prove, but the Other Crime Evidence, as we have explained, is highly probative of Siegel's intent. The district court, however, excluded the Other Crime Evidence *in its entirety*, without considering whether there was other evidence that could establish the elements necessary to prove the § 1512(a)(1)(C) charge.

A trial where none of the Other Crime Evidence was admitted would certainly be shorter than a trial where all of the Other Crime Evidence was admitted and subjected to thorough cross-examination, and the district court's preference for a shorter trial focusing only on the conduct related to Jack Watkins is understandable. The district court, however, has other tools available to it to ensure that the trial proceeds as expeditiously as possible — for example, by requiring to the extent possible that the direct and cross-examination of Siegel's ex-husbands and daughters focus on the specifics of Siegel's actions — while still giving the government sufficient "latitude during trial to carry its burden of proof." *Janati*, 374 F.3d at 274. Under these cir-

cumstances, we simply cannot conclude that the district court's preference for a shorter, more focused trial provides a sufficient basis for the wholesale exclusion of the Other Crime Evidence, evidence that, as we have explained, is relevant, admissible, and highly probative. *Cf. United States v. Colomb*, 419 F.3d 292, 297 (5th Cir. 2005) ("Although decisions that a court makes under Rule 611 may indirectly affect whether proof is admitted, the Rule does not provide an independent ground for excluding otherwise-admissible evidence."). Accordingly, after carefully considering the nature of the Other Crime Evidence, we are constrained to conclude that the district court erred by granting Siegel's motion in limine to preclude the government from introducing the Other Crime Evidence at trial.

IV.

We pause briefly to address the district court's decision to strike as surplusage the portions of the indictment setting forth the Charged Other Crime Evidence. The district court's decision to strike the allegations flowed directly from its conclusion that the Other Crime Evidence should be excluded; the district court concluded that the Other Crime Evidence was inadmissible, and the court then struck from the indictment any allegations touching on the evidence deemed inadmissible.

Given our determination that the Other Crime Evidence was admissible under Rule 404(b) and not excludable under Rule 403, there simply is no basis for striking the allegations of the Charged Other Crime Evidence from the indictment. *See Williams*, 445 F.3d at 733 ("A motion to strike surplusage from the indictment should be granted only if it is clear that the allegations are not relevant to the charge and are inflammatory and prejudicial." (internal quotation marks and alteration omitted)).

V.

To summarize, we conclude that we have jurisdiction over the government's appeal from the district court's pre-trial decisions to exclude from trial the Other Crime Evidence and to strike from the indictment allegations of the Charged Other Crime Evidence. We also conclude that the Other Crime Evidence, individually and as a whole,

is admissible under Rule 404(b) and, at least on the record before us, cannot be excluded under Rule 403. Finally, given our determination that the Other Crime Evidence is admissible, we conclude that the district court erred by striking allegations of the Charged Other Crime Evidence from the indictment.

Accordingly, for the foregoing reasons, we hereby reverse the district court's decision excluding the Other Crime Evidence and its decision striking allegations of the Charged Other Crime Evidence from the indictment, and we remand the case for trial.

*REVERSED AND REMANDED*

KISER, Senior District Judge, concurring in part and dissenting in part:

I concur with part II of the opinion which holds that the court has jurisdiction over the appeal pursuant to 18 U.S.C. § 3731. I dissent to part III, however, because the majority does not review the district judge's factual and evidentiary rulings under the proper standard — abuse of discretion.

I.

In ruling on the admissibility of the Other Crime Evidence proffered by the government and set forth in the indictment, the trial court is required to make factual determinations. Fed. R. Evid. 104(a). "The applicability of a particular rule of evidence often depends upon the existence of a condition . . . To the extent that these inquiries are factual, the judge acts as a trier of fact. Often, however, rulings on evidence call for an evaluation in terms of a legally set standard . . . These decisions, too, are made by the judge." Fed. R. Evid. 104(a) advisory committee's note.

First a judge has to decide whether the "other crimes" are intrinsic to the charged offense. Second, if the "other crimes" are not intrinsic, then admissibility must be tested under Federal Rules of Evidence 404(b) and 403. As the majority recognizes, the trial court found that the Other Crime Evidence was not properly part of the alleged

scheme as set forth in the charged counts, nor was it admissible under Rules 404(b) and 403. Viewing these rulings on an abuse of discretion standard, I would largely uphold the district judge's determinations.

As the majority points out, all of the charged offenses, including the murder, involve Jack Watkins. Siegel's relations with him began in 1994 and her fraudulent conduct with regard to him continued through June 2003 (even though Watkins was allegedly murdered on or about May 13, 1996). The Charged Other Crime Evidence was sought to be introduced solely as part of the "scheme or artifice to defraud" elements of the mail and wire fraud charges. This evidence included:

1. 1968-1985: Siegel opened credit accounts under the identity of her first husband, Charles Kucharski.

2. 1985-1993: Siegel defrauded Ted Giesendaffer, her second husband. When confronted she became violent.

3. 1992-1994: Siegel had John Mayberry sign an auto loan for her, then used that information to take out an unrelated loan for $3,000. She repaid the loan in 1994.

4. 1992-2003: Siegel met Eric Siegel, her third husband in 1992. The relationship was periodically interrupted before they finally married in 1998. Defendant took over Mr. Siegel's existing accounts and opened new ones, resulting in approximately $300,000 in losses to Mr. Siegel. He repaid these debts.

5. 1994: After Jack Butcher gave her a $3,000 loan, she defaulted on the loan and unsuccessfully attempted to use Mr. Butcher's personal information to take out a loan. Siegel became hysterical when he threatened to go to the police.

6. 1997: Siegel stole mail from the mailbox of James and Janice Lee and opened various credit accounts using their identities.

7. 1996: Siegel used her daughters' identities to open credit accounts. She also used their identities to cash benefit checks made out to Watkins.

The government also sought to introduce Uncharged Other Crime Evidence, which consisted of four separate incidents in which Siegel stole an acquaintance's wallet and used the information found therein to defraud the victim. These incidents occurred between January 1993 and December 1994. Siegel pled guilty to these crimes and received a suspended sentence and probation, which was still effective when she murdered Watkins.

## II.

### A.

The trial judge found that these other crimes were not properly part of a common scheme with the charged crimes, but rather that they were discrete acts of fraud. Indeed, the only thing in common with the charged crimes was the element of deception, but that can be said of all fraudulent conduct. Where the incidents were temporally separated, used different means, and were otherwise unrelated to the charged conduct, a district judge does not abuse his discretion in refusing to allow the government to present these other incidents as part of the scheme. *See McLendon v. United States*, 2 F.2d 660, 660-61 (6th Cir. 1924) ("it has never yet been thought that the 'scheme to defraud' . . . could be found in the mere succession of diverse swindles, unrelated save as they had a common stage.").

The district judge did abuse his discretion with regard to the evidence that Siegel used her daughters' identities to cash Watkins's checks. This is clearly intrinsic to the charged conduct and must therefore be admissible.

### B.

That the government chose to denominate these other crimes as part of a scheme does not free them from scrutiny by the trial judge as to whether they qualify as part of the scheme. Nor does it free the evidence from the constraints of Rules 404(b) and 403. The majority finds that the trial court did not adequately explain why he found the evidence to be unduly prejudicial under Rule 403. I disagree. Rule 403 provides that evidence may be excluded if the court finds it to

cause "unfair prejudice, confusion of the issues . . . or by considerations of undue delay."

In explaining his ruling the district judge spoke to these concerns: "[W]hile that's very interesting evidence and relevant in a very expansive way . . . the Court is satisfied that it is inflammatory, unduly prejudicial, is certain to give rise to a waste of time, it is cumulative and its probative value is significantly outweighed by its prejudicial and unfair prejudicial effect." J.A. 424-25. Because the trial judge found that the Other Crime Evidence has little legal relevance, his conclusion differs from that of the government and the majority. Because this ruling was within the district judge's discretion, the majority errs in overturning it.

## C.

Testing the Other Crimes Evidence against the requirements of Rule 404(b), the district judge found that if offered by the government in its case-in-chief it would not qualify under any exception to the Rule. Instead, the district judge found that it would only be used to demonstrate that which Rule 404 is meant to prohibit — criminal character and propensity. It must be remembered that the court's ruling went only to the opening statement and the government's case-in-chief. The court left open the question of whether the evidence would be admissible after Siegel put on her defense. Of course, if Siegel should testify the evidence would be available for impeachment purposes.

Under Rule 404(b), the Other Crime Evidence may also be admissible if it is used as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." The majority opines that the Other Crime Evidence fits under several of these options. In analyzing each of these, the majority explains why it would have reached a different conclusion than the district judge. However, it is never explained why the district judge's decision was an abuse of discretion.

Initially, the majority opinion argues that much of the Other Crime Evidence goes toward Siegel's motive for killing Watkins. Under this theory, Siegel killed Watkins not only to prevent him from telling the

government about the crimes she had perpetuated against him, but also because then the Other Crime Evidence would be discovered. Because the Other Crime Evidence would have affected her prison term and restitution obligations, she had an enhanced motive to try to keep the Other Crime Evidence hidden.

In its analysis, the majority relies on *Willoughby*, 860 F.2d 15, 24 (2d Cir. 1988). In *Willoughby* the defendants were charged with obstruction of justice for seeking to prevent witnesses from testifying at their trial for robbery. The challenged evidence, which the district judge admitted, was the defendants' participation in that robbery. The court concluded that "when a defendant has been charged with attempted or actual obstruction of justice with respect to a given crime, evidence of the underlying crime and the defendant's part in it is admissible to show the motive for his efforts." *Id.*

*Willoughby* is inapplicable to the present case for two reasons. First, the district court in that case admitted the challenged evidence and the circuit court concluded that this was not an abuse of discretion. Second, the challenged evidence here is not part of the underlying crime. This analysis would be appropriate if the challenged evidence was Siegel's defrauding of Watkins. As discussed above, however, the district judge concluded that the Other Crime Evidence was not part of the scheme, and thus not part of the underlying crime. It is true that the Other Crime Evidence may have been relevant to enhance Siegel's motive to silence Watkins, but the district court found that the prejudice sufficiently outweighed the probative value of such evidence. The government already had a solid motive and the cumulative nature of this evidence was disproportionately prejudicial. Thus it was not an abuse of discretion to exclude it.

The district judge did abuse his discretion, however, by failing to admit two pieces of evidence under this theory. First, Siegel's relationship and subsequent defrauding of Eric Siegel should be admitted. The overlap of their relationship with Siegel's relationship with Watkins and her incentive of having access to Eric Siegel's substantial financial resources provide ample proof of motive.

Second, Siegel's suspended sentence and probation which stemmed from the wallet thefts enhanced her motive to prevent Watkins from

going to the police because she would have received a separate and increased penalty. This motive is considerably more concrete and thus more probative than the theoretical motives advanced by the government for the rest of her earlier crimes. The district judge recognizes this theory of relevance and says "depending on how things go, I'm not foreclosing the government from persuading me . . . I'm not totally foreclosing the possibility that the Government will persuade me to admit evidence of at least one, of no more than one I should say of the wallet theft incidents." J.A. 426. The motive is not created by the wallet thefts themselves, but instead by the suspended sentence and probation. Due to the heightened probative value of this evidence, the district judge, having recognized the valid purpose of this evidence, abused his discretion by excluding it.

Next, the majority determines that the Other Crime Evidence is admissible under the "identity" or "*modus operandi*" exception to Rule 404(b). Evidence of this type should be admitted where the crimes are similarly unique and distinctive. *See United States v. Haney*, 914 F.2d 602, 607 (4th Cir. 1990) (noting that the evidence demonstrated a "signature crime."). The *modus operandi* that the majority points to here is that Siegel obtained her victims' personal information, used that information to obtain credit, and took steps to conceal her fraud. These are the routine steps in any identity theft crime. There is nothing sufficiently unique to admit this evidence under this exception to Rule 404(b).

The majority also justifies reversing the district court judge's exclusion of the Other Crime Evidence because it could be used to refute Siegel's potential defense strategies. For example, evidence that Siegel stole from her first husband to cover her gambling debts should be admitted to refute her potential defense that Watkins's financial difficulties were caused by his own gambling problem. Every defendant has the right to elect to provide no defense at all, and the government would still be required to meet its burden. Therefore, it is improper for the government to present evidence which is used solely to attack a defense which has not yet been presented. It certainly is not an abuse of discretion to, as here, exclude such evidence from being presented during the government's case-in-chief.

### III.

Whether the excluded evidence was intrinsic to the charged scheme was a fact committed to the judgement of the district court under Rule 104 and must be reviewed under an abuse of discretion standard. *Burt Rigid Box, Inc. v. Travelers Property Casualty Corp.*, 302 F.3d 83, 92 (2d Cir. 2002). Whether the excluded evidence was admissible under Rules 404(b) and 403 is also reviewed under an abuse of discretion standard.

"Judgments of evidentiary relevance and prejudice are fundamentally a matter of trial management, for trial judges are much closer to the pulse of a trial than we can ever be and broad discretion is necessarily accorded them. The standard of review therefore counsels deference to the discretion of trial courts. In a criminal appeal, we will not vacate a conviction unless we find that the district judge acted arbitrarily or irrationally in admitting evidence." *United States v. Benkahla*, No. 07-4778, 2008 WL 2486741, at *7 (4th Cir. June 23, 2008). The same would apply for the exclusion of evidence.

Because the majority has failed to apply the abuse of discretion level of review to the rulings of the district judge, I dissent.